State of Maryland v. Michael Eugene Stone, No. 16, September Term, 2025

**FOURTH AMENDMENT – TRAFFIC STOP – REASONABLE SUSPICION – TEXTING WHILE DRIVING –** Supreme Court of Maryland held that where conduct observed by officer is consistent with legal or illegal use of mobile phone, to justify traffic stop, police officer must be able to credibly identify specific facts, not applicable to general law-abiding public, "which, taken together with rational inferences from those facts," Terry v. Ohio, 392 U.S. 1, 21 (1968), under totality of circumstances, reasonably establish that violation of Md. Code Ann., Transp. (1977, 2020 Repl. Vol.) ("TR") §§ 21-1124, 21-1124.1, or 21-1124.2 has occurred or may be occurring.

Supreme Court concluded that where police officer observes driver manipulating, touching, or pressing screen of mobile phone, without additional information, reasonable and prudent officer would not be justified in believing that person had violated traffic laws governing use of mobile phone while driving. Such limited observations are equally consistent with lawful mobile phone use and therefore do not eliminate substantial portion of innocent drivers or supply particularized facts required to justify stop under TR §§ 21-1124, 21-1124.1, or 21-1124.2.

Circuit Court for Washington County
Case No. C-21-CR-23-000386

Argued: October 3, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 16

September Term, 2025

_____

STATE OF MARYLAND

v.

MICHAEL EUGENE STONE

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Watts, J.
Biran, Gould, and Eaves, JJ., dissent.

_____

Filed: January 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Texting while driving is a form of "distracted driving" that poses a serious risk to individuals, including drivers, their passengers, other people in vehicles on the road, and pedestrians. Studies have shown that distracted driving increases the risk of car accidents and can be more dangerous than drinking and driving. See Morgan Gough, *Judicial Messaging: Remote Texter Liability as Public Education*, 44 U. Balt. L. Rev. 469, 469 (2015) (footnotes omitted). In 2009 and 2010, in response to the growing problem of distracted driving, the General Assembly enacted Md. Code Ann., Transp. (1977, 2020 Repl. Vol.) ("TR") §§ 21-1124.1 and 21-1124.2, which govern the use of text messaging devices and handheld phones while driving. See 2009 Md. Laws 1137 (Vol. II, Ch. 194, S.B. 98); 2009 Md. Laws 1139 (Vol. II, Ch. 195, H.B. 72); 2010 Md. Laws 3615 (Vol. IV, Ch. 538, S.B. 321).

TR § 21-1124.1(b) prohibits a person from writing, sending, or reading a text message or an electronic message on a text messaging device while operating a motor vehicle in the travel portion of the roadway. The statute, however, permits a driver to use a global positioning system (GPS) or a text messaging device to contact a 9-1-1 system while operating a motor vehicle. See TR § 21-1124.1(c). Under TR § 21-1124.2(d)(2), drivers may not use their hands to use a handheld telephone while a vehicle is in motion, with the exception of initiating or terminating a call or turning the handheld telephone on or off. The statute also does not prohibit the emergency use of a handheld telephone for calls to, among other places, a 9-1-1 system, and use of a handheld telephone as a text messaging device as defined in TR § 21-1124.1. See TR § 21-1124.2(b)(1) and (b)(3). In other words, drivers may use their hands to use a handheld telephone to initiate or terminate

a call, turn a handheld telephone on or off, use GPS, or contact a 9-1-1 system or other emergency services.[1]

"The Supreme Court [of the United States] has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment." Ferris v. State, 355 Md. 356, 369, 735 A.2d 491, 497 (1999) (citations omitted). This Court has joined other courts in holding that a traffic stop is justified under the Fourth Amendment "if the officer had a reasonable articulable suspicion that a traffic law has been violated." State v. Williams, 401 Md. 676, 690, 934 A.2d 38, 46-47 (2007) (citations omitted).

In this case, the issue is whether police officers had reasonable suspicion to justify the stop of Michael Eugene Stone, Respondent, for allegedly operating a vehicle in violation of TR §§ 21-1124, 21-1124.1, or 21-1124.2.

In the Circuit Court for Washington County, the State, Petitioner, charged Mr. Stone with possession of fentanyl with the intent to distribute and other charges stemming from a stop of his vehicle. Prior to trial, Mr. Stone filed a motion to suppress evidence that was recovered pursuant to the stop. At the suppression hearing, two police officers, who participated in the stop of Mr. Stone's vehicle, gave testimony about their observations. One of the officers testified that, before stopping the vehicle, he observed the driver "manipulat[ing]" a cell phone that was attached to the windshield or the dashboard of the

---

[1]TR § 21-1124 was enacted in 2005, see 2005 Md. Laws 3142 (Vol. IV, Ch. 543, H.B. 394); 2005 Md. Laws 3147 (Vol. IV, Ch. 544, S.B. 50), and provides that an individual under the age of 18 "may not use a wireless communication device while operating a motor vehicle[,]" TR § 21-1124(c), except to contact 9-1-1 or as permitted as a text messaging device under TR § 21-1124.1, see TR § 21-1124(b).

vehicle, and that "it appeared like [the driver] was typing a message or placing a phone call[.]" The prosecutor asked the officer to explain why he thought that and what he actually observed. The officer responded: "I saw him with his right hand manipulate the phone, touching it while he was driving down the roadway." This time, the officer did not mention having opined that the manipulation of the phone appeared like typing a message or placing a phone call and did not claim to have seen the driver doing either. The other officer testified that the driver had "a cellphone that was stuck to the windshield of the vehicle" and that he observed the driver "pressing the screen" of the cell phone.

The circuit court denied the motion to suppress, reasoning that "[s]eeing a person manipulating the phone is enough reasonable articulable suspicion because they, in this day and age they could easily be texting." After a trial by jury, Mr. Stone was convicted and sentenced to imprisonment. The Appellate Court of Maryland reversed the judgment of the circuit court, concluding that the officers had observed innocuous behavior that, without additional observations, was not indicative of criminal activity. See Stone v. State, No. 1488, Sep. Term, 2023, 2025 WL 289120, at *1, *9 (Md. App. Ct. Jan. 24, 2025).

In this Court, the State contends that the officers had reasonable suspicion to conduct a traffic stop for use of a mobile phone while driving in violation of TR §§ 21-1124 through 21-1124.2 because they observed Mr. Stone manipulating a mobile phone in a manner that was consistent with sending a text message or initiating a phone call. According to the State, the question is "whether officers who have observed a driver engaged in conduct consistent with illegal use of a mobile phone, but who have been unable to rule out lawful use, are empowered under the Fourth Amendment to perform a brief

investigatory stop to dispel the ambiguity of whether the driver has violated the relevant statutes."

Conversely, Mr. Stone responds that to satisfy the reasonable suspicion standard where apparently innocent conduct is involved, police officers must explain why the conduct is reasonably suspicious, and officers cannot rely on "overly generalized descriptions" of a person's behavior to meet the standard.

After consideration of the relevant statutes and case law of the Supreme Court of the United States, this Court, and other jurisdictions, we affirm the judgment of the Appellate Court and hold that where conduct observed by a police officer is consistent with the legal or illegal use of a text messaging device or handheld telephone, to justify a traffic stop, an officer must be able to credibly identify specific facts, not applicable to a substantial portion of the general law-abiding public, "which, taken together with rational inferences from those facts," Terry v. Ohio, 392 U.S. 1, 21 (1968), under the totality of circumstances, reasonably establish that a violation of TR §§ 21-1124 through 21-1124.2 has occurred or may be occurring. We conclude that a police officer's observation of a driver "manipulating," "touching," or "pressing" the screen of a mobile phone does not, alone, provide reasonable suspicion of a violation of TR §§ 21-1124 through 21-1124.2. An investigatory stop, even a brief one, is a seizure; and, a person, including the driver of a motor vehicle seen touching or manipulating the screen of a mobile phone, is entitled to the full protection of the Fourth Amendment reasonable suspicion standard with respect to investigatory stops initiated by police officers.

Our holding stems directly from the holding of the Supreme Court of the United

States in Terry, 392 U.S. at 21—that to justify a particular intrusion, a police officer must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"—and our own myriad of case law holding that "the reasonable suspicion standard requires the police to possess a particularized and objective basis for suspecting legal wrongdoing[,]" Lewis v. State, 398 Md. 349, 362, 920 A.2d 1080, 1087 (2007) (citation modified). It is well settled that a police officer's observation of innocent conduct that may or may not be indicative of illegal activity cannot constitute reasonable suspicion for an investigatory stop unless the officer can credibly identify specific facts that gave rise to suspicion of illegal activity based on the circumstances known to the officer at the time of observation, and those facts and any rational inferences that may be drawn from them would cause a reasonable police officer to believe that criminal activity was or may be occurring. See Terry, 392 U.S. at 30.

We reaffirm our holdings in Ferris, 355 Md. at 386-87, 735 A.2d at 507, and Cartnail v. State, 359 Md. 272, 291, 753 A.2d 519, 529-30 (2000), that it is not sufficient that law enforcement officials can state reasons why they stopped a driver; in addition, the facts taken together must be "out of the ordinary" and rule out "a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." (Citation modified). Based on the principles set forth above, we conclude that where a police officer observes a driver manipulating, touching, or pressing the screen of a phone, without additional information, a reasonable and prudent officer would not be justified in conducting a stop to investigate a violation of the traffic laws governing use of a mobile phone while driving. Such limited observations are not "out of the ordinary" and do not

rule out "a substantial portion of innocent" drivers, <u>Cartnail</u>, 359 Md. at 291, 753 A.2d at 530 (citation modified), and do not constitute facts from which, together with the rational inferences that may be drawn from them, are sufficient to satisfy the requirement for reasonable suspicion of a violation of TR §§ 21-1124, 21-1124.1, or 21-1124.2. For these reasons, the officers' stop of Mr. Stone's vehicle was unreasonable and violated the Fourth Amendment.

## BACKGROUND

Mr. Stone was charged by criminal information with three offenses related to the unlawful possession of fentanyl stemming from a traffic stop that occurred on May 5, 2023.[2] Mr. Stone was not charged with texting while driving or any violation of TR §§ 21-1124, 21-1124.1, or 21-1124.2.

On Friday, May 5, 2023, at around 9:18 p.m., Officers Scott Huff and Travis Wheat of the Hagerstown Police Department were traveling in a marked police car near North Potomac Street and Broadway in Hagerstown. Officer Wheat was driving, and Officer Huff was in the front passenger seat of the vehicle. The officers observed a black Mercedes Benz vehicle turn from Broadway onto Potomac Street and turn onto West North Avenue and then turn onto North Prospect Street. The officers had been following the vehicle and activated emergency equipment and stopped the vehicle.

At the suppression hearing, Mr. Stone's counsel contended that any statements made

---

[2]At the start of trial, the State entered a *nolle prosequi* as to one of the charges, possession of fentanyl in the amount of approximately 8 grams, leaving possession of fentanyl and possession of fentanyl with intent to distribute.

by Mr. Stone and items recovered from his car should be suppressed because the stop of his vehicle was unlawful. Mr. Stone's counsel advised that, after the unlawful stop, Mr. Stone had been "effectively strip searched on the side of the road."

When asked by the circuit court about the facts, the prosecutor responded that Officers Huff and Wheat were driving and "they s[aw] a person driving while holding a cellphone in violation of Transportation Article." According to the prosecutor, the officers pulled the driver over and there was "an arrest for driving without a license[.]" The prosecutor stated that the officers saw marijuana in Mr. Stone's car. The prosecutor advised the court that Mr. Stone had not been strip searched and that the vehicle was searched under the Carroll doctrine.[3]

> The officers gave brief testimony about the stop. Officer Huff testified as follows:
>
> [PROSECUTOR:] Okay, and bringing your attention to about a little after 2100 hours, what happened?
>
> [OFFICER HUFF:] Myself and Officer Wheat were riding in a two man patrol cruiser. We observed a black Mercedes Benz with a temporary Maryland registration turn off of Broadway and travel south onto Potomac Street and make a right on North Ave.
>
> [PROSECUTOR:] And did there, did anything occur to you of concern about that driver?

---

[3]In Robinson v. State, 451 Md. 94, 108-09, 152 A.3d 661, 670 (2017), we explained:

> Generally, for a search to be reasonable, a law enforcement officer must obtain a warrant. One exception to the warrant requirement is the "automobile exception," under which a law enforcement officer may conduct a warrantless search of a vehicle based on probable cause. The automobile exception originates from the case of Carroll [v. United States], 267 U.S. 132 [(1925)], and has been referred to the as "the Carroll doctrine."

(Citations omitted).

[OFFICER HUFF:] While we were behind it going west on West North Ave, we observed the operator begin to manipulate the cellphone that was mounted to the dash or windshield, and it appeared like he was typing a message or placing a phone call while he was driving the vehicle.

[PROSECUTOR:] Okay, why did you think that? . . . What did you observe? Describe what you observed.

[OFFICER HUFF:] I saw him with his right hand manipulate the phone, touching it while he was driving down the roadway.

[PROSECUTOR:] Okay, and what happened next?

[OFFICER HUFF:] He made a left onto North Prospect Street and acted like he was going to make a turn into a parking spot. Officer Wheat activated his emergency equipment. We conducted a traffic stop on the vehicle. He made an abrupt right turn to the opposite side of the roadway and parked in a parking spot.

Officer Wheat testified as follows:

[PROSECUTOR:] Okay, and around 2100 hours, around 2118 hours do you recall what occurred?

[OFFICER WHEAT:] Yes, myself and Officer Huff conducted a traffic stop on a vehicle that had came from Broadway and traveled on West North Ave.

[PROSECUTOR:] Okay, and when you say you both conducted, who is -- were you in the same patrol vehicle?

[OFFICER WHEAT:] Yes, sir, we were in the same patrol vehicle. I was driving and Officer Huff was in the front passenger seat.

[PROSECUTOR:] Okay, what happened? Why, why did you conduct a traffic stop? . . .

[OFFICER WHEAT:] While we were behind the vehicle going up West North Ave in the 100th block I observed the driver, he had a cellphone that was stuck to the windshield of the vehicle. I could see the cellphone illuminated when I was behind it, and I saw him pressing the screen while he was driving.

- 8 -

[PROSECUTOR:] Was the vehicle in motion while he was pressing it?

[OFFICER WHEAT:] That's correct.

[PROSECUTOR:] It was?

[OFFICER WHEAT:] Yes, sir.

[PROSECUTOR:] Okay, what happened next after you saw that?

[OFFICER WHEAT:] We followed the vehicle and we turned onto North Prospect Street and as I was calling the vehicle stock out to dispatch it appeared as if the vehicle was going to park on the east side of the 400 block of Prospect. I saw that it was getting ready to park, so I activated my emergency equipment, and the vehicle went to the other side of the road and pulled over and we conducted a traffic stop there.

[PROSECUTOR:] What was the reason for the traffic stop?

[OFFICER WHEAT:] It was for the using the mobile device while the vehicle was in motion.

Body-worn camera footage, which was admitted into evidence, revealed that Officer Huff informed Mr. Stone that he was stopped for "using the phone while driving." Mr. Stone responded that he "was trying to get ahold of" someone.

The bulk of the officers' testimony concerned events that occurred after the stop. Officer Huff testified that, after the vehicle was stopped, he smelled marijuana and obtained consent from Mr. Stone to search the vehicle. Officer Huff testified that Officer Wheat searched the vehicle and located a vial, which was a glass vial with white residue and a small rock-like substance believed to be crack cocaine in it.[4]

---

[4]In contrast, Officer Wheat testified that, after confirming that Mr. Stone did not have a license, he called for a tow truck and began an inventory search of the vehicle, which he described as "a search of the vehicle to check for damages, valuables left inside of the vehicle before the tow truck comes."

Officer Huff testified that, after Officer Wheat located the vial, Mr. Stone was placed under arrest. Officer Wheat searched the area between Mr. Stone's legs and below his genitals and "felt an object that was not consistent with the human anatomy[.]" After Mr. Stone was placed in handcuffs, Officer Wheat removed a purple bag from inside Mr. Stone's pants, which contained "a glass smoking device and a metal push rod." While the bag was being removed, "Mr. Stone stated he had dope in . . . his pants which is street slang for fentanyl and heroin." The officers put Mr. Stone closer to the patrol cruiser "outside public viewing" and Officer Wheat pulled Mr. Stone's pants away from his body, pulling the waistband outward.[5] Officer Wheat removed a folded sock from inside Mr. Stone's underwear and recovered suspected fentanyl caps.

At the conclusion of the suppression hearing, the circuit court denied the motion to suppress, stating:

> Officer Huff's testimony, and this is a summary not an official transcript. While we were behind, we observed the operator begin and I've learned that both Officers were together. We observed the operator to begin to manipulate the cellphone that was mounted to the dash, and it appeared that he was typing a message or placing a phone call while he was driving the vehicle. Well, [prosecutor], what did you observe? I saw him with his right hand manipulate the phone touching it while he was driving down the roadway. Officer Wheat's testimony is, I observed the driver. He had a cellphone stuck to the windshield of the vehicle. I could see the cellphone illuminated. I was behind it, and I saw him pressing the screen while he was driving. [Prosecutor], was the vehicle in motion? That is correct.
>
> ***
>
> So, the, you know the standard for the stop is reasonable articulable

---

[5]Officer Wheat's testimony concerning his search of Mr. Stone was similar to that of Officer Huff. Officer Wheat testified that, during the search, he never pulled Mr. Stone's pants down and he did not strip Mr. Stone.

suspicion. Seeing a person manipulating the phone is enough reasonable articulable suspicion because they, in this day and age they could easily be texting. And it wouldn't matter if they were actually making a telephone call because making a telephone call looked exactly like texting. So, it's what the person, what it appears to it. So, the initial stop is supported by reasonable articulable suspicion. A very close call. If, if the Officer would have testified, looked like he was making a telephone call then if that was the reasonable articulable suspicion then this, this case would be, would be dead at that point. But he says it looked like he was making a call or sending a text message and Officer Wheat's testimony is the same.

The manipulation of a cellphone does provide reasonable articulable suspicion. It would not be enough to provide, you know, a -- certainly a conviction for that offense and the Officer does not have to charge him with that offense to make the initial stop.

The balance of the continuation of the stop, the check of his driving history, that he's not licensed, he can't drive the car, etcetera, the keeping the vehicle on the scene and the inventory that stems from that is therefore not suppressed.

After a jury trial, Mr. Stone was found guilty of possession of fentanyl and possession of fentanyl with intent to distribute. The circuit court sentenced Mr. Stone to ten years of imprisonment with all but six years suspended, to be followed by three years of probation.

**Opinion of the Appellate Court of Maryland**

On January 24, 2025, in an unreported opinion, the Appellate Court of Maryland reversed the circuit court's judgment. See Stone, 2025 WL 289120, at *1, *9. In determining whether the reasonable suspicion standard had been satisfied, the Appellate Court turned first to TR § 21-1124.1 and noted that, although the statute prohibits a motorist from "using 'a text messaging device to write, send, or read a text message or an electronic message while operating a motor vehicle in the travel portion of the roadway[,]'" it carves

- 11 -

out exceptions and "does not apply to the use of (1) a global positioning system; or (2) a text messaging device to contact a 9-1-1 system." Id. at *5 (citation modified). The Appellate Court pointed out that "[a]n additional exception is provided under TR § 21-1124.2(d)(2), which states, '[a] driver of a motor vehicle that is in motion may not use the driver's hands to use a handheld telephone other than to initiate or terminate a wireless telephone call or turn on or turn off the handheld telephone.'" Id. (second alteration in original).

The Appellate Court stated that, although both Officers Huff and Wheat testified at the suppression hearing that they saw Mr. Stone manipulate the cell phone, "neither officer distinguished how [Mr. Stone] appeared to be texting as opposed to initiating or terminating a call." Id. at *8. The Appellate Court explained that "[t]estimony from the officers describing why they believed [Mr. Stone] was violating traffic laws [was] limited: '[I]t appeared like he was typing a message' and 'I saw him pressing the screen while driving.'" Id. (second alteration in original). The Appellate Court stated that the officers did not provide details, such as "how long they observed [Mr. Stone] manipulate his phone or whether he appeared distracted." Id. And, the Appellate Court noted that "Officer Huff testified, alternatively, stating 'it appeared like he was typing a message or placing a phone call while he was driving.'" Id.

By way of analogy, the Appellate Court observed that, in Williams, 401 Md. at 692, 934 A.2d at 47-48, this Court "examined whether an officer had reasonable suspicion to conduct a traffic stop where he perceived a driver's windows to be illegally tinted[,]" and we concluded that, to rely on a law enforcement officer's observations in establishing

- 12 -

reasonable suspicion, "the officer must have been able to articulate the difference between an illegally tinted window and one without tinting." Stone, 2025 WL 289120, at *4, *9. The Appellate Court also explained that, in Lewis, 398 Md. at 368, 920 A.2d at 1091, this Court's holding "indicated that officers cannot conduct traffic stops for innocuous behavior unless there is some additional evidence to suspect criminal activity." Stone, 2025 WL 289120, at *9.

After reiterating that "[i]n Maryland, there are several exceptions for phone usage while driving, such as using a GPS, calling 9-1-1, and initiating or terminating a call[,]" the Appellate Court concluded that, in its view, pressing a cell phone screen while driving is "innocuous behavior unless additional information indicates criminal activity." Id. Accordingly, the Appellate Court held that the circuit court erred in denying the motion to suppress because there was insufficient evidence in the record from which it could have properly concluded that the officers "had reasonable suspicion to conduct a traffic stop of [Mr. Stone's] vehicle." Id.[6]

In a dissenting opinion, the Honorable Glenn T. Harrell reasoned that the circuit court did not err because "where conduct viewed by an officer may be interpreted as either legal or illegal, officers are permitted to dispel that suspicion (via an investigatory stop) and resolve the ambiguity." Id. at *9-10 (Harrell, J., dissenting) (citation modified). Judge

---

[6]The Appellate Court noted that its conclusion was consistent with cases decided by other jurisdictions, such as People v. Corrales, 152 Cal. Rptr. 3d 667 (Cal. Ct. App. 2013), State v. Dalton, 850 S.E.2d 560 (N.C. Ct. App. 2020), and State v. Struve, 956 N.W.2d 90 (Iowa 2021), in which "officers provided at least some additional description of the suspected illegal behavior beyond pressing a screen, or the officers distinguished the illegal behavior from legal behavior." Stone, 2025 WL 289120, at *9.

Harrell opined that, under the relevant statutes, "whether the operator of a[] moving motor vehicle is making lawful or unlawful use of a cell phone" may often present "an ambiguity[,]" and "resolving the ambiguity under the Maryland statutes merited an investigatory stop[.]" Id. at *10 (Harrell, J., dissenting).

## Petition for a Writ of *Certiorari*

On March 11, 2025, the State petitioned for a writ of *certiorari*, raising the following issue:

> Do police officers have reasonable suspicion to effectuate a traffic stop for use of a mobile phone while driving in violation of §§ 21-1124 to 21-1124.2 of the Transportation Article when they observe a driver manipulating a mobile phone in a manner that is consistent with sending a text message or initiating a phone call?

On May 22, 2025, we granted the petition. See State v. Stone, 490 Md. 432, 336 A.3d 176 (2025).

## DISCUSSION

### Standard of Review

This Court's review of a circuit court's denial of a motion to suppress evidence under the Fourth Amendment is limited to information contained in the record of the suppression hearing. See Sizer v. State, 456 Md. 350, 362, 174 A.3d 326, 333 (2017). We accept the facts as found by the trial court, unless clearly erroneous, and review the facts, and any reasonable inferences that can be drawn from those facts, in the light most favorable to the party who prevailed on the motion to suppress, in this case, the State. See id. at 362, 174 A.3d at 333. Although we extend great deference to the trial court's findings of fact on a motion to suppress, we review the trial court's "legal conclusions *de novo*,

- 14 -

making our own independent constitutional evaluation as to whether the officer's encounter with the defendant was lawful." Id. at 362, 174 A.3d at 333 (citing Ferris, 355 Md. at 368, 735 A.2d at 497). "[O]ur plenary review of the record for error requires application of the facts under a totality of the circumstances analysis." Id. at 363, 174 A.3d at 333.

**Statutes Governing Text Messaging while Driving**

TR §§ 21-1124, 21-1124.1, and 21-1124.2 govern the use of wireless communication devices, text messaging devices, and handheld telephones while driving in Maryland. TR § 21-1124, titled "Use of wireless communication device by permit holders or provisional licensees prohibited," provides in relevant part:

> (a)(1) In this section the following words have the meanings indicated.
> (2) "9-1-1 system" has the meaning stated in § 1-301 of the Public Safety Article.
> (3) "Wireless communication device" means a handheld or hands-free device used to access a wireless telephone service.
>
> (b) This section does not apply to the use of a wireless communication device:
> (1) To contact a 9-1-1 system; or
> (2) As a text messaging device as defined in § 21-1124.1 of this subtitle.
>
> (c) An individual who is under the age of 18 years may not use a wireless communication device while operating a motor vehicle.

TR § 21-1124.1, titled "Use of text messaging device while driving prohibited," provides in pertinent part:

> (a)(1) In this section the following words have the meanings indicated.
> (2) "9-1-1 system" has the meaning stated in § 1-301 of the Public Safety Article.
> (3) "Text messaging device" means a handheld device used to send a text message or an electronic message via a short message service, wireless telephone service, or electronic communication network.

- 15 -

(b) Subject to subsection (c) of this section, an individual may not use a text messaging device to write, send, or read a text message or an electronic message while operating a motor vehicle in the travel portion of the roadway.

(c) This section does not apply to the use of:
    (1) A global positioning system; or
    (2) A text messaging device to contact a 9-1-1 system.

TR § 21-1124.2, titled "Use of handheld telephone while driving prohibited,"

provides in relevant part:

(a)(1) In this section the following words have the meanings indicated.
    (2) "Handheld telephone" means a handheld device used to access wireless telephone service.
    (3) "9-1-1 system" has the meaning stated in § 1-301 of the Public Safety Article.

(b) This section does not apply to:
    (1) Emergency use of a handheld telephone, including calls to:
        (i) A 9-1-1 system;
        (ii) A hospital;
        (iii) An ambulance service provider;
        (iv) A fire department;
        (v) A law enforcement agency; or
        (vi) A first aid squad;
    . . .
    (3) Use of a handheld telephone as a text messaging device as defined in § 21-1124.1 of this subtitle[.]
    . . .

(c) The following individuals may not use a handheld telephone while operating a motor vehicle:
    (1) A driver of a Class H (school) vehicle that is carrying passengers and in motion; and
    (2) A holder of a learner's instructional permit or a provisional driver's license who is 18 years of age or older.

(d)(1) This subsection does not apply to an individual specified in subsection (c) of this section.
    (2) A driver of a motor vehicle that is in motion may not use the driver's hands to use a handheld telephone other than to initiate or terminate

a wireless telephone call or to turn on or turn off the handheld telephone.

## Reasonable Suspicion

### *Fourth Amendment Case Law on Reasonable Suspicion: The Framework*

The primary significance of the Fourth Amendment is that it protects against unreasonable government invasion of the sanctity of one's person, home, and effects. The Fourth Amendment is not a guarantee against all searches and seizures; it is a guarantee against unreasonable ones. See, e.g., United States v. Sharpe, 470 U.S. 675, 682 (1985); Wilson v. State, 409 Md. 415, 427, 975 A.2d 877, 884 (2009). The protections of the Fourth Amendment are applicable to the States through the Fourteenth Amendment. See, e.g., Kelly v. State, 436 Md. 406, 421, 82 A.3d 205, 213 (2013).

In Terry, 392 U.S. at 30, the Supreme Court of the United States held that a police officer may stop a person on the street and frisk the person without probable cause to arrest, if the police officer has a reasonable suspicion that "criminal activity may be afoot[,]" and has a reasonable belief that the person "may be armed and presently dangerous[.]"[7] In reaching this conclusion, the Supreme Court explained that "it is necessary first to focus upon the governmental interest which allegedly justifies" the intrusion upon a person's constitutionally protected interests, as "there is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." Id. at 20-21 (citation modified). The Supreme Court

---

[7]This Court has stated that the "real thrust" of Terry "is directed at instances in which there is reasonable suspicion that someone is about to commit or has just committed a crime." Anderson v. State, 282 Md. 701, 706, 387 A.2d 281, 284 (1978) (citation omitted).

made clear that, in justifying the intrusion at issue, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21 (footnote omitted).

The Supreme Court stated that the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Id. at 21 n.18 (citations omitted). In making a determination as to reasonable suspicion, it is crucial that "the facts be judged against an objective standard[,]" with the question being: "would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21-22 (citations omitted).

Reasonable suspicion is a lower threshold than probable cause, which is necessary for obtaining a warrant or making an arrest. See id. at 20, 24; see also Longshore v. State, 399 Md. 486, 494, 924 A.2d 1129, 1133 (2007). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). There is no one-size-fits-all litmus test that governs the reasonable suspicion standard, and the Supreme Court of the United States has said that any attempt to develop one would undoubtedly be futile. See Ornelas v. United States, 517 U.S. 690, 695-96 (1996). "Reasonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal

technicians, act[,]" and the Supreme Court has described the approach as a "commonsense approach[.]" Navarette v. California, 572 U.S. 393, 402 (2014) (citation modified). With respect to reasonable suspicion, however, the Supreme Court has stated that "[t]he officer . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation modified).

In Illinois v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court of the United States adopted the totality of the circumstances test for determining probable cause for issuance of a search warrant. Since its decision in Gates, the Supreme Court has consistently held that the totality of the circumstances standard applies when a court assesses both probable cause and reasonable suspicion. See, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case[.]"). In United States v. Cortez, 449 U.S. 411, 418 (1981), the Supreme Court explained that the totality of the circumstances test contains two interdependent analytical techniques:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. . . . The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

Although there is no bright-line test, these cases make clear that certain basic

principles apply to the assessment of reasonable suspicion. First, the "demand for specificity" is vital to a determination of reasonable suspicion. Terry, 392 U.S. at 21 n.18 (citations omitted). Second, the reasonable suspicion determination is a highly fact-specific inquiry, and the facts must be assessed against an objective standard. See id. at 21-22, 30. Third, at bottom, for a court to uphold a particular intrusion based on reasonable suspicion, a police officer must be able to identify or state specific facts which, when considered together with the rational inferences that may be drawn from those facts, under the totality of the circumstances, raise a suspicion that a particular individual may be engaged in wrongdoing and demonstrate that a particular intrusion was objectively reasonable. See id. at 21, 30.

### The Reasonable Suspicion Standard and Innocent Conduct

Consistent with the principles above, an officer's observation of innocent conduct that could be indicative of legal or illegal activity may constitute reasonable suspicion where an officer can credibly explain why the observed activity was believed to be suspicious under the circumstances, and the facts, and rational inferences that can be drawn therefrom, reasonably warrant the intrusion at issue. See, e.g., Terry, 392 U.S. at 21-23; Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curiam); Sokolow, 490 U.S. at 9-10; Cartnail, 359 Md. at 290-91, 753 A.2d at 529-30; Lewis, 398 Md. at 365, 920 A.2d at 1089. "[A] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." Crosby v. State, 408 Md. 490, 508, 970 A.2d 894, 904 (2009) (citation modified). "[T]he reasonable suspicion standard carries limitations; it does not

allow a law enforcement official to simply assert that innocent conduct was suspicious to him or her." Id. at 508, 970 A.2d at 904 (citation modified). Instead, "the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity." Id. at 508, 970 A.2d at 904 (citations omitted).

The United States Supreme Court's decisions in Terry, Reid, and Sokolow, and our case law applying those decisions serve as guides for determining under what circumstances a police officer's observation of apparently innocuous behavior can provide the basis for reasonable suspicion. In Terry, 392 U.S. at 22-23, in determining whether an officer acted reasonably in stopping a person where apparently innocuous behavior had been observed, the Supreme Court explained that there was nothing suspicious about a person standing together with another person on a street corner, strolling up and down a street alone or with another, or looking into store windows. See id. But, the manner in which the individuals in Terry engaged in the behavior, together with the reasonable inferences that the officer was entitled to draw, were sufficient to establish reasonable suspicion for a stop. See id. at 23.

In Reid, 448 U.S. at 441, the Supreme Court of the United States held that factual circumstances that "describe a very large category of presumably innocent" people cannot, without more, justify a seizure. In Reid, id. at 439, 441, where an agent of the federal Drug Enforcement Administration stopped the petitioner and another man outside of an airport after having observed the petitioner occasionally look backward in the direction of the man

as they walked through a concourse,[8] the Supreme Court concluded that the stop was not justified by reasonable suspicion and "that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity" based on the circumstances. The Supreme Court explained that only the fact that the petitioner walked in front of another person and occasionally looked back at him potentially related to their alleged conduct (being supposed drug couriers), but that the other circumstances described "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Id. at 441.

In Sokolow, 490 U.S. at 9-10, the Supreme Court of the United States upheld an investigatory stop, concluding that a series of acts that appear naturally innocent if considered separately may collectively warrant further investigation on grounds of reasonable suspicion.[9] The Supreme Court explained that "*Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together

---

[8]The petitioner and the man were seen speaking briefly in the main lobby of the terminal and then leaving the terminal together. See Reid, 448 U.S. at 439. During the stop, the petitioner began to run and abandoned his shoulder bag; the bag was recovered and found to contain cocaine. See id.

[9]The respondent had been stopped by Drug Enforcement Administration agents upon his arrival at the airport in Honolulu, and the agents found a large amount of cocaine in the respondent's carry-on luggage. See Sokolow, 490 U.S. at 3. The agents knew that the respondent had paid $2,100 in $20 bills for two airplane tickets and traveled under a name that did not match the name under which his telephone number was listed; that his original destination was Miami, a "source city for illicit drugs"; and that the respondent stayed only 48 hours in Miami, despite the fact that a round-trip flight from Honolulu to Miami takes 20 hours. Id. In addition, the respondent had "appeared nervous during his trip" and checked none of his luggage. Id.

- 22 -

warranted further investigation." Id. at 10 (citation modified). The Supreme Court stated that "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile'[10] does not somehow detract from their evidentiary significance as seen by a trained agent." Id. The Supreme Court noted that "[p]aying $2,100 in cash for two airplane tickets [was] out of the ordinary," that it was "even more out of the ordinary to pay that sum from a roll of $20 bills[,]" and that few residents of Honolulu would "travel from that city for 20 hours to spend 48 hours in Miami during the month of July." Id. at 8-9. The Supreme Court concluded that, taken together, based on the facts of the case, government agents had reasonable suspicion that the respondent was transporting illegal drugs. See id. at 8-10.

In Ferris, 355 Md. at 386-87, 735 A.2d at 507-08, we considered the issue of innocent conduct and when it can lead to reasonable suspicion. We adopted the reasoning of the United States Court of Appeals for the Third Circuit in Karnes v. Skrutski, 62 F.3d 485 (3d Cir. 1995), which harmonized the Supreme Court's holdings in Reid and Sokolow. See Ferris, 355 Md. at 387, 735 A.2d at 507; see also Cartnail, 359 Md. at 290-91, 753 A.2d at 529-30. In Ferris, 355 Md. at 386, 735 A.2d at 507, we explained that the Third Circuit concluded that, "although the factors relied upon in *Sokolow* to find reasonable suspicion were consistent with innocent travel, they were nonetheless 'out of the ordinary.'" (Quoting Karnes, 62 F.3d at 493). The Third Circuit drew a distinction

---

[10]The respondent contended that the agent's beliefs were based in part on "drug courier profiles." Sokolow, 490 U.S. at 10.

between individual factors that "are consistent with innocent travel, but nonetheless out of the ordinary, and individual factors [that] are both consistent with innocent travel and too common place to be probative in tending to show criminal activity." Ferris, 355 Md. at 386-87, 735 A.2d at 507 (citation modified). In Karnes, 62 F.3d at 493, the Third Circuit held that the reasonable suspicion inquiry is based on the totality of the circumstances, but must be narrow enough to eliminate a large number of objectively innocent people, stating:

> *Reid* and *Sokolow*, taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. This is a totality of the circumstances test.

(Citation omitted).

In Ferris, 355 Md. at 369, 387, 735 A.2d at 498, 507-08, applying the principles set forth in Karnes, we concluded that where the petitioner had been lawfully stopped for a traffic infraction (speeding) and a citation had been issued, the factual circumstances fell short of establishing reasonable suspicion that the petitioner was involved in criminal activity that justified continued detention. We determined that the facts identified by a State trooper—that the petitioner had extremely bloodshot eyes and was nervous and that there was a lack of the odor of alcohol—were "too weak, individually or in the aggregate, to justify reasonable suspicion of criminal activity." Id. at 387, 735 A.2d at 508. We explained that those factors could fit a very large number of presumably innocent travelers, "who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Ferris, 355 Md. at 387, 735

A.2d at 508 (quoting Reid, 448 U.S. at 441).  We stated that "[t]he Fourth Amendment [] does not allow the law enforcement official to simply assert that apparently innocent conduct was suspicious to him or her; rather, the officer must offer the factual basis upon which he or she bases the conclusion."  Id. at 391-92, 735 A.2d at 510 (citation modified).

After Ferris, in Cartnail, 359 Md. at 291, 753 A.2d at 529-30, another case involving a vehicle stop, we once more endorsed the Third Circuit's holding in Karnes, 62 F.3d at 493, that "it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied."  In Cartnail, 359 Md. at 277-78, 753 A.2d at 522, a police officer stopped a vehicle driven by the defendant based on suspicion that he and the passenger with him were involved in a robbery that occurred earlier that morning.  Testimony at the suppression hearing revealed that the suspects from the robbery were reported to be travelling in a different make of car than the defendant's vehicle, and it had been reported that there were three suspects in the vehicle, not two.  See id. at 277-78, 753 A.2d at 522.

We held "that the record of the suppression hearing . . . fail[ed] to establish that a reasonable and prudent police officer would have had reasonable suspicion to stop [the defendant.]"  Id. at 289, 753 A.2d at 528-29.  We explained that, as the State admitted, the defendant was not engaged in any suspicious activity, there was no reason to believe that he was involved in another criminal case, and he appeared to be lawfully operating his

- 25 -

vehicle. See id. at 290, 753 A.2d at 529.[11] "Here, a reasonable police officer had only facially innocent activity to generate reasonable suspicion because no suspicious activity had been personally observed." Id. at 290, 753 A.2d at 529 (footnote omitted).

We explained that, in Reid, 448 U.S. at 441, the Supreme Court determined that "factual circumstances which 'describe a very large category of presumably innocent travelers' cannot, in and of themselves, justify a seizure." Cartnail, 359 Md. at 290, 753 A.2d at 529 (citation omitted). We concluded that, "although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Cartnail, 359 Md. at 294, 753 A.2d at 531 (citation modified). We stated:

> By refusing to harbor the fruits of unconstitutional seizures, we give teeth to the notion that the courts cannot accord police carte blanche to pick and choose whom to stop based on some "hunch" that a motorist, or his or her passengers, are involved in criminal activity such as in the case *sub judice*. . . . We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment. As aptly noted by Justice

---

[11]We applied the "LaFave factors" for assessing whether the reasonable suspicion standard had been satisfied:

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

Cartnail, 359 Md. at 289, 753 A.2d at 528 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.)).

Scalia: "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."

Id. at 297, 753 A.2d at 532-33 (citation modified).

**Vehicle Stops**

*Relevant Maryland Case Law*

Construing TR §§ 21-1124, 21-1124.1, and 21-1124.2 is an issue of first impression for this Court and in Maryland case law. In Santos v. State, 230 Md. App. 487, 490-91, 495, 148 A.3d 117, 118-19, 121 (2016), the Appellate Court of Maryland upheld the stop of a vehicle, by officers in an unmarked vehicle, where the driver was observed not wearing a seat belt and was seen "manipulating" a cell phone. For other reasons, the officers suspected that a drug transaction had taken place but stopped the vehicle for a traffic violation. See id. at 490-91, 148 A.3d at 118-19. In court proceedings, the defendant conceded that although only uniformed officers may stop a driver for seat belt violations, there is no similar limitation for stopping a driver while using a handheld telephone. See id. at 495, 148 A.3d at 121. As such, the Appellate Court's opinion mainly addressed whether the officers had reasonable suspicion to extend the traffic stop to investigate suspected drug activity. See id. at 498-505, 148 A.3d at 122-27. The Appellate Court was not required to conduct an analysis of whether the stop was warranted under the Transportation Article statutes at issue in this case.

Despite a dearth of case law addressing TR §§ 21-1124, 21-1124.1, and 21-1124.2, our holdings in Ferris and Cartnail, and in other cases involving traffic stops, are instructive. In Lewis, 398 Md. at 353, 365-67, 920 A.2d at 1082, 1089-90, a case in which

we held that police officers lacked reasonable suspicion for a traffic stop, we reaffirmed the principles set forth in Karnes that we adopted in Ferris and Cartnail. In Lewis, 398 Md. at 353, 358, 920 A.2d at 1082, 1085, we held that the trial court erred in denying the defendant's motion to suppress "because the police did not have articulable reasonable suspicion to stop [the defendant] based upon the fact that he 'almost' hit the [police] car." We explained that "[a]lmost causing an accident could include driving less than the speed limit, passing another car appropriately or merely parallel parking." Id. at 369, 920 A.2d at 1091. We stated that, as explained in Cartnail, 359 Md. at 290, 753 A.2d at 529, the reasons identified by a police officer for an investigatory stop "together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." Lewis, 398 Md. at 366, 920 A.2d at 1089-90.

In Williams, 401 Md. at 678, 934 A.2d at 39, we affirmed the trial court's order suppressing evidence where a deputy, who was on the lookout for a car possibly carrying drugs, stopped the defendant's vehicle because the deputy "concluded that the rear window of [the defendant's] car was darker than 'normal.'" Id. at 679, 934 A.2d at 40. After stopping the vehicle, the deputy called for a K-9 officer (a dog) who arrived and alerted for drugs. See id. at 681, 934 A.2d at 41. Four days later, the defendant took the car to the State Police Automotive Safety Enforcement Division, which found that the tint on the windows was legal. See id. at 681, 934 A.2d at 41.

We concluded that the traffic stop was a <u>Whren</u> stop.[12] and that the deputy "used what he believed to be a tinting violation as a pretext to stop the car in order to allow a backup K-9 officer time to arrive and scan the car for suspected [drugs]." <u>Id.</u> at 685, 934 A.2d at 43-44. We determined that the evidence presented at the suppression hearing did not establish reasonable suspicion that the rear window of the defendant's car exceeded the level of tinting permitted by Maryland law. <u>See</u> <u>id.</u> at 691, 934 A.2d at 47. We explained "that an officer's observations may be the basis for such a stop, if those observations truly suffice to give a reasonable articulable suspicion that one or more windows are not in compliance with the statutory and regulatory requirements." <u>Id.</u> at 691, 934 A.2d at 47. We stated that, where an officer chooses to stop a car for a window tinting violation based on a visual observation, if the officer can "credibly articulate" the difference between what a properly tinted window—a window compliant with the relevant statute's tinting percentage requirement—looks like and the tinting of the defendant's window, a court could find reasonable suspicion. <u>Id.</u> at 692, 934 A.2dd at 47-48.

In <u>Crosby</u>, 408 Md. at 509-10, 515, 970 A.2d at 905, 908, we held that the conduct that caused the law enforcement officer to initiate a traffic stop, which included the petitioner slumping down in his seat as he drove by the officer, "was, by itself, wholly innocent" and that, "[w]ithout particularized and objective reasons that support a different

_____

[12]A stop for a traffic violation where law enforcement officers are in fact suspicious of criminal activity is commonly called a "*Whren* stop[,]" referring to the case of <u>Whren v. United States</u>, 517 U.S. 806 (1996), in which the Supreme Court of the United States "found no Constitutional impediment to [] a pretextual stop," where an officer had probable cause to believe that a traffic violation, in fact, had occurred. <u>Williams</u>, 401 Md. at 685, 934 A.2d at 43-44.

interpretation of what he observed, viewed in the totality of the circumstances, [the officer's] belief that criminal activity was afoot amounted to no more than an inchoate and unparticularized suspicion or hunch." (Citation modified). We reiterated that "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Id. at 512, 970 A.2d at 907 (citation modified).

In Rowe v. State, 363 Md. 424, 441, 769 A.2d 879, 889 (2001), we concluded that a State trooper's observation of the defendant's "momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change or unsafe entry onto the roadway," conduct which is prohibited by TR § 21-309, and as such could not support a traffic stop. In reaching this conclusion, we explained that "even temporary or limited restraints on the liberty of a person during a traffic stop may not be constitutionally permissible if, under all of the circumstances, the traffic stop was unreasonable." Id. at 432, 769 A.2d at 884.

The following principles arise from these cases. First, "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Lewis, 398 Md. at 366, 920 A.2d at 1090 (citation modified). Second, "it is not enough that law enforcement officials can articulate reasons why they stopped [a driver]"; the reasons "together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." Ferris, 355 Md. at 387, 735 A.2d at 507 (citation modified); Cartnail, 359 Md. at 291, 753 A.2d at 529-30 (citation modified). Third, there is nothing

about the nature of an investigatory detention during a traffic stop that lessens the requirement that the reasons for the stop must satisfy the reasonable suspicion standard.

*Case Law from Other Jurisdictions*

Although not controlling of this Court's analysis of the Fourth Amendment principles governing enforcement of Maryland transportation statutes, we observe that courts in other jurisdictions have addressed issues similar to those in this case under different statutes. In a case with facts similar to the case before us, State v. Morsette, 924 N.W.2d 434, 435-36 (N.D. 2019), the Supreme Court of North Dakota concluded that there was not reasonable suspicion to initiate a traffic stop of the defendant in connection with the use of a cell phone while driving. North Dakota law provided that an "operator of a motor vehicle that is part of traffic may not use a wireless communications device to compose, read, or send an electronic message[,]" but that a driver could, among other permissible activities, read, select, or enter a telephone number, input, select, or read information on a GPS device, and use a device to obtain emergency assistance. Id. at 437-38 (citation modified). A law enforcement officer in a patrol car stopped at a red light "observed a driver in the adjacent lane manipulating his touchscreen cell phone for approximately two seconds." Id. at 436. The officer saw the driver "tap approximately ten times on the illuminated cell phone screen[,]" and initiated a traffic stop based on these observations. See id.

The Supreme Court of North Dakota observed that, under the relevant statute, both prohibited and permitted phone-related activities "appear to encompass actions that may require finger-to-phone tapping; for example, the proscribed activity of composing an

electronic message could involve finger-to-phone tapping and the permitted activity of entering a telephone number could involve finger-to-phone tapping." Id. at 438. The Court noted that the officer who initiated the traffic stop "could not see the content of the screen at the time of the tapping." Id. at 440. The Court observed that there had been no testimony elicited concerning the officer's "past success rate at identifying violations of the cell phone-use-while-driving law or any unique training he received enabling him to conclude the facts he observed amounted to violations of the law." Id. The Court concluded that there was no link between the officer's observations and an objectively reasonable basis to suspect a violation of the law and that the officer "was unable to articulate why his suspicion was reasonable." Id.

In another case with very similar facts, in United States v. Paniagua-Garcia, 813 F.3d 1013, 1014 (7th Cir. 2016), applying Indiana law on texting while driving, the United States Court of Appeals for the Seventh Circuit held that "[t]he government failed to establish that [an] officer had . . . a reasonable suspicion that [the defendant] was violating the no-texting law." The Indiana law at issue prohibited drivers from using a telecommunications device, *e.g.*, a cell phone, to type, transmit, or read a text message or electronic mail message or emailing while operating a motor vehicle, but permitted all other uses of cell phones by drivers. See id. at 1013. The officer, in the course of passing a car driven by the defendant on an interstate highway, observed the driver holding a cell phone in his right hand with his head bent toward the phone, and testified that the driver "appeared to be texting." See id. at 1014. "[T]he officer [] never explained what created the appearance of texting as distinct from any one of the multiple other—lawful—uses of

a cellphone by a driver," and the government conceded that the defendant had been looking for music as he told the officer, not texting.  Id.

The Seventh Circuit concluded that, because Indiana's no-texting law precluded only texting and emailing while driving and permitted all other uses, it was not reasonable for an officer to stop a driver observed using a cell phone without evidence that the officer saw texting as opposed to activity that is "consistent with any one of a number of lawful telephone uses."  Id.  The Seventh Circuit observed that there would be "[n]o *fact* perceptible to a police officer glancing into a moving car and observing the driver using a cellphone [that] would enable the officer to determine whether it was a permitted or a forbidden use[,]" and concluded that the government failed to establish "reasonable suspicion that [the defendant] was violating the no-texting law."  Id. (citation omitted).  The Seventh Circuit explained that "[t]he officer hadn't seen any texting; what he had seen was consistent with any one of a number of lawful uses of cellphones."  Id.  The Seventh Circuit concluded:

> The government presented no evidence of what percentage of drivers text, and is thus reduced to arguing that a mere possibility of unlawful use is enough to create a reasonable suspicion of a criminal act.  But were that so, police could always, without warrant or reasonable suspicion, search a random pedestrian for guns or narcotics.

Id.

By contrast, under different circumstances, courts in some other jurisdictions have concluded that officers had reasonable articulable suspicion that cell phones were being used unlawfully to justify traffic stops.  In State v. Struve, 956 N.W.2d 90, 94 (Iowa 2021), the Supreme Court of Iowa held "that observations of a driver holding a phone in front of

his face and actively manipulating the screen for at least ten seconds . . . justified stopping the driver to resolve any ambiguity about whether the driver was violating" Iowa's texting-while-driving statute, Iowa Code section 321.276. In Struve, id., two police officers were driving next to a vehicle and observed the driver holding a phone in front of his face; the officers saw the driver "manipulating" the screen of the phone with his finger and could see the glow of the phone from their car. While driving next to the car for around ten seconds, the officers saw the driver continuing to manipulate the phone with his finger. See id. The officers then initiated a traffic stop. See id. The officers' vehicle camera recorded the incident, and the video was introduced into evidence during the suppression hearing. See id. at 94, 102.

At the time of the stop, section 321.276 of the Iowa Code had recently been expanded to provide that "[a] person shall not use a hand-held electronic communication device to write, send, or view an electronic message while driving a motor vehicle unless the motor vehicle is at a complete stop off the traveled portion of the roadway[,]" but continued to permit "use of a cell phone for navigation; to conduct voice calls; to activate, deactivate, or initiate other functions of a cell phone; and in specific safety-related circumstances." Id. at 99 (citation modified). Under the statute, an "electronic message" was expressly defined as including "images visible on the screen of a hand-held electronic communication device including a text-based message, an instant message, a portion of

electronic mail, an internet site, a social media application, or a game." Id.[13]  Relying on

the United States Supreme Court's decision in Kansas v. Glover, 589 U.S. 376 (2020),[14]

and its own decision in State v. Vance, 790 N.W.2d 775 (Iowa 2010),[15] the Supreme Court

of Iowa explained that "[a]n officer is expected to make commonsense judgments and

_____

[13]In Struve, 956 N.W.2d at 98, the Court noted that, "[p]rior to July 1, 2017, section 321.276 prohibited a driver from using a cell phone 'to write, send, or read a text message while driving a motor vehicle unless the motor vehicle was at a complete stop off the traveled portion of the roadway.'" (Citation modified).  In addition, the prohibition applied to text-based messages, instant messages, and email messages. See id.  And, section 321.276 was a secondary offense, "which mean[t] an officer could not stop a driver for violating it but could only cite a driver if lawfully stopped for another traffic violation." Id.

[14]In Glover, 589 U.S. at 378, the United States Supreme Court held that the stop of a driver was justified by reasonable suspicion where an officer ran a check on a vehicle's license plate and discovered that the vehicle owner's driver's license was revoked.  The Supreme Court explained that to initiate a brief investigative traffic stop an officer must have a "particularized and objective basis to suspect legal wrongdoing" though, to satisfy this standard, an officer may also consider "commonsense judgments and inferences about human behavior." Id. at 376 (citation modified).  Importantly, before initiating the stop, the officer "knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle." Id. at 381.  The Supreme Court concluded that the result of the license plate check, along with the officer's "commonsense inference that the [registered owner] was likely the driver of the vehicle," constituted reasonable suspicion for the stop. Id.  "The fact that a registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the] inference." Id.  The Court explained that Kansas' license-revocation scheme applies to drivers who have already demonstrated a disregard for the law by being convicted of certain crimes or "are categorically unfit to drive[.]" Id. at 376.  Although the Supreme Court repeated in one sentence the often-quoted observation that reasonable suspicion does not require "51% accuracy," its holding was driven by the conclusion that common experience reveals that drivers with revoked licenses continue to drive and that the concerns underlying Kansas' grounds for revocation lent credence to the inference that the owner of a vehicle with a revoked Kansas license could be the person driving the vehicle. Id. at 381-83.

[15]In Vance, 790 N.W.2d at 781, the Supreme Court of Iowa had reached the same conclusion as the United States Supreme Court did in Glover when assessing comparable facts involving the stop of a motorist earlier.

inferences about human behavior when stopping a motorist engaged in suspicious behavior." Struve, 956 N.W.2d at 97 (citation modified). In determining that the stop was justified, the Court concluded that the officers' "commonsense suspicion" that the defendant "was illegally using his cell phone [was] supported by empirical data reflecting that a large percentage of drivers admit to reading or writing texts while driving, even while recognizing such activity as dangerous." Id. at 103 (citation omitted).

In State v. Dalton, 850 S.E.2d 560, 566 (N.C. Ct. App. 2020), the Court of Appeals of North Carolina held that the trial court's findings of fact, under the totality of the circumstances, supported the conclusion that a police officer "had a reasonable, articulable suspicion to believe that criminal activity was afoot (*i.e.*, that the defendant was using a cell phone in a manner proscribed by law)." North Carolina law prohibited a person operating a motor vehicle from using a mobile phone to text or read electronic mail or text messages but permitted such actions if the vehicle was lawfully parked or stopped and permitted use of a GPS device or voice operated technology. See id. at 564-65. A police officer observed a vehicle traveling with a "large glow" coming from inside of it, which became "more prevalent" as the officer followed the vehicle. Id. at 562. The officer "discovered that the glow was being produced by a cellular device held by the driver[,]" who was the sole occupant of the car. Id. The officer described the phone as "up in the air" and that it appeared that the driver was texting. Id. The officer then initiated a traffic stop. See id.

In affirming the trial court's ruling, the Court explained that the officer had testified, based on his experience, that if the defendant had been using a mapping system on the

device, as the defendant had claimed, "it would be a look, and then placing the phone down as opposed to holding it up the entire street just to get to a stop sign, and then to make a left turn onto a street." Id. (citation modified). The Court concluded that, "just because a person may be using a wireless telephone while operating a motor vehicle for a valid purpose does not, *ipso facto*, negate the reasonable suspicion that the person is using the device for a prohibited use." Id. at 566. The Court stated that it would be unlikely that someone, such as the officer, who is observing a person using a mobile device from a distance, "would be able to definitively determine the specific use of the device in hand[,]" but that, under the facts presented, the trial court properly determined that the officer had reasonable, articulable suspicion that the defendant had violated the law. Id.

In People v. Corrales, 152 Cal. Rptr. 3d 667, 669-70 (Cal. Ct. App. 2013), the Court of Appeal of California for the Second District, Division 5, held that no Fourth Amendment violation had occurred where officers stopped a vehicle after observing the driver use a cell phone to send a text message while the vehicle was parked and, minutes later, observed the driver appearing to text while driving.[16] California law provided that a person shall not drive a motor vehicle while using an electronic wireless communications device to write, send, or read a text message, instant message, or electronic mail, unless the device was

---

[16]Police officers first saw the defendant parked on the side of the road using a cell phone to send a text message. See Corrales, 152 Cal. Rptr. 3d at 669. The officers drove past the defendant and, five minutes later, approached the defendant again, as the defendant was pulling out into traffic. See id. The officers followed the defendant and observed that he was leaning and looking down and making movements with his hand as if he was texting; according to the officers, the defendant continued to text for 30 to 40 seconds. See id.

designed and configured to allow voice-operated or hands-free operation.  See id. at 670.

The officer who had been driving the patrol car testified that he had been a police officer

for 16 years when the defendant was stopped.  See id.  The Court concluded that the facts

demonstrated that the stop was reasonable, explaining: "[The] defendant was observed

using his cellular telephone, while parked by the side of a road, to send a text message.

Five minutes later, defendant was engaged in conduct an experienced police officer could

reasonably believe involved texting while driving, a violation of" California law.  Id. [17]

---

[17]The Court of Appeals of Oregon considered the issue of a stop for alleged texting while driving in two cases, finding probable cause in one but not in the other.  In Oregon, "[a]n officer who stops and detains a person for a traffic violation must have probable cause to believe that the person has committed a violation."  State v. Rabanales-Ramos, 359 P.3d 250, 253 (Or. Ct. App. 2015) (citations omitted).  In Rabanales-Ramos, id. at 251-52, a case with facts more similar to this one, a trooper observed a "light coming up to defendant's face that he believed was coming from a device that was in her hand that she was looking down at" and "[t]he light from the device remained on for approximately 10 seconds." (Citation modified).  The Court interpreted the statute at issue as prohibiting use of a cell phone for communication (talking and texting), but not other activities that can be performed using a cell phone, and concluded that the trooper's belief that the defendant had used the device "was not objectively reasonable under the circumstances."  Id. at 256.  The Court noted that "the trooper did not testify to any further observations that would indicate that defendant was using the device in a way that violate[d]" the Oregon statute, *i.e.*, "using it to receive and transmit voice or text communication."  Id. (footnote omitted).

On the other hand, in State v. Nguyen Ngoc Pham, 433 P.3d 745, 746 (Or. Ct. App. 2018), the Court concluded that a traffic stop was supported by probable cause where police officers observed the defendant holding a cell phone in his hand as he was driving, saw the screen was lit up, saw the defendant pushing something on the screen although the officer could not identify the specific action the defendant was performing, and saw the defendant immediately put the cell phone down when the defendant noticed the police car next to him.  The Court concluded that the defendant immediately putting his phone down after noticing the police car next to him suggested that the defendant himself believed his use of the cell phone was unlawful.  See id. at 747.  The Court held that, "[g]iven those observations, it was reasonable for the officers to infer that defendant was unlawfully using his phone to receive and transmit voice or text communication" and that the trial court was correct in determining the officers had probable cause to support the stop.  Id. (citation modified).

## This Case

### *The Officers' Observations*

In this case, the State contends that "police officers had reasonable suspicion to effectuate a traffic stop for use of a mobile phone while driving in violation of" TR §§ 21-1124 through 21-1124.2 "when they observed [Mr.] Stone manipulating his mobile phone in a manner that was consistent with sending a text message or initiating a phone call." (Capitalization omitted). According to the State, "the officers described the precise nature of Mr. Stone's manipulation of the mobile phone, which included pressing the screen of the phone, as consistent with typing a text message—illegal conduct under the statute."

The circuit court ruled that "[t]he manipulation of a cellphone does provide reasonable articulable suspicion" "because [], in this day and age [a person] could easily be texting. And it wouldn't matter if they were actually making a telephone call because making a telephone call looked exactly like texting."[18] We will address both the circuit court's ruling that an officer's observation of a person manipulating a phone while driving is alone sufficient to establish reasonable suspicion for a stop and the State's point that Officer Huff testified that "it appeared like [the driver] was typing a message or placing a call."

First, contrary to the circuit court's decision, it is clear that not every driver observed manipulating, or even touching, or pressing the screen of a cell phone while driving can

---

[18]The circuit court found that Officer Huff observed Mr. Stone "manipulate" his phone, and Officer Wheat observed Mr. Stone "pressing the screen" of his phone while driving.

reasonably be suspected of violating TR §§ 21-1124, 21-1124.1, or 21-1124.2.  TR §§ 21-1124 through 21-1124.2 expressly permit legal uses of a mobile phone while driving, such as turning the phone on and off, using GPS, and contacting 9-1-1 or other emergency services.  Given the nature of the statutory prohibitions and permitted uses, a police officer who observes a driver "manipulating," "touching," or "pressing" a mobile phone while driving uncovers innocuous behavior that cannot, without additional observations, rise to the level of reasonable suspicion to justify an investigatory stop.  See Terry, 392 U.S. at 22-23; Sokolow, 490 U.S. at 9-10; Lewis, 398 Md. at 365-66, 368-69, 920 A.2d at 1089-90, 1091; Morsette, 924 N.W.2d at 438, 440.  It is not necessary, however, that the additional observations be of conduct that definitively violates TR §§ 21-1124 through 21-1124.2; rather, the additional observations may reflect conduct that may be permitted but, when taken together with the rational inferences that stem from the conduct, reasonably warrant a belief that the driver is or may be violating the traffic law.

Where a police officer observes a driver manipulating, touching, or pressing the screen of a phone, without additional information, a reasonable and prudent officer would not be justified in believing that the person may have violated traffic laws governing use of a mobile phone while driving.  Limited observations of this type are not "out of the ordinary[,]" *i.e.*, do not rule out "a substantial portion of innocent" drivers, Cartnail, 359 Md. at 291, 753 A.2d at 530 (citation modified), and do not constitute facts from which, together with the rational inferences that may be drawn from them, are sufficient to satisfy the requirement for reasonable suspicion of a violation of TR §§ 21-1124, 21-1124.1, or 21-1124.2.  As explained by courts in other cases, "[a] suspicion so broad that [it] would

permit the police to stop a substantial portion of the lawfully driving public . . . is not reasonable." United States v. Flores, 798 F.3d 645, 649 (7th Cir. 2015) (citations omitted); see also Reid, 448 U.S. at 441. Where a police officer has observed innocuous conduct—conduct that may or may not be indicative of illegal activity to satisfy the reasonable suspicion standard—the officer must be able to credibly identify specific facts that gave rise to suspicion of illegal activity based on what was known to the officer at the time, and the facts and rational inferences that may be drawn from them must reasonably warrant the intrusion that is at issue. See Terry, 392 U.S. at 21.

Next, the manner in which the State phrases its contention—that officers had reasonable suspicion to effectuate a traffic stop for use of a mobile phone while driving when they observed Mr. Stone manipulating the phone in a manner that was consistent with sending a message or initiating a phone call—demonstrates that the officers' observations did not reach the level of reasonable suspicion necessary to justify a stop of Mr. Stone's vehicle. Under the State's view of the evidence, Officer Huff testified that the conduct he observed was, under the Transportation Article, either completely innocent behavior (placing a phone call) or innocuous conduct indicative of lawful or unlawful activity (typing a message).[19] In instances in which courts have found reasonable suspicion for an investigatory stop based on an officer's observation of innocuous conduct that could be indicative of either illegal or legal activity, officers have observed conduct that, based

---

[19]Under TR §§ 21-1124.1(c) and 21-1124.2(b), (d)(2), a driver typing while driving would be lawful if the driver were contacting emergency services or typing instructions for a GPS service or turning a phone on or off.

on specific facts, gave the officers reasonable grounds to believe that a person was or may have been engaged in illegal activity. See, e.g., Terry, 392 U.S. at 22-23; Sokolow, 490 U.S. at 8-10; Struve, 956 N.W.2d at 105; Dalton, 850 S.E.2d at 565; Corrales, 152 Cal. Rptr. 3d at 669-70. Although the conduct that the officers observed could have been equally indicative of legal or illegal activity, the officers described particularized facts and circumstances, which the court found credible, that would have caused an objectively reasonable police officer to believe that criminal activity was or may have been occurring. See Terry, 392 U.S. at 22-23; Sokolow, 490 U.S. at 8-10; Struve, 956 N.W.2d at 105; Dalton, 850 S.E.2d at 565; Corrales, 152 Cal. Rptr. 3d at 669-70.

In such cases, the officer's testimony was not that the officer had observed either: (1) conduct that could, in fact, have been completely innocent, or (2) conduct that could have been indicative of legal or illegal activity, with no explanation as to why the latter type of conduct led to reasonable suspicion of criminal activity or a traffic violation. The purpose of the investigatory stop was not for an officer to determine which type of conduct the person may have been engaged in—completely innocent conduct (such as placing a call) or conduct that could have been indicative of unlawful or lawful activity (such as typing a message). Here, as the circuit court found, if Officer Huff had merely observed the driver manipulating the phone in a manner that appeared to be placing a call, the case would have been "dead at that point."

Although information necessary to establish reasonable suspicion may be less reliable than that required to establish probable cause and absolute certainty is not required, it is well settled that, to justify an investigatory stop, an officer must have formed a

- 42 -

reasonable suspicion, *i.e.*, a reasonable belief, that a person has or may be engaged in conduct that may constitute a violation of the law. See Terry, 392 U.S. at 21, 30. In Terry, id. at 22-23, the police officer observed a mixture of conduct that, albeit when viewed alone, was innocent in nature but when taken together caused the officer to believe for specific reasons that a crime was about to occur. The officer did not testify, in the alternative, that he suspected that the men he observed were either engaged in conduct that was entirely innocent (that they were perhaps just looking around) or conduct that may or may not have been indicative of criminal activity. Rather, the officer provided a detailed description of the conduct observed and testified that after observing the behavior of the men, he suspected them of "casing a job, a stick-up[.]" Id. at 6. To satisfy the reasonable suspicion standard, an officer "must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity[,]" Crosby, 408 Md. at 508, 970 A.2d at 904 (citations omitted), and the facts and inferences drawn therefrom must reasonably warrant the intrusion at issue, see Terry, 392 U.S. at 21.

In its brief, the State cites Illinois v. Wardlow, 528 U.S. 119, 125 (2000), for the proposition that "'*Terry* recognized that the officers could detain the individuals to resolve [] ambiguity[.]'" According to the State, in Wardlow, the Supreme Court recognized the conduct at issue in Terry was "ambiguous and susceptible to an innocent explanation, but that, because another reasonable interpretation was that the individuals were casing the store for a planned robbery," the stop was justified. This is far from so. In Wardlow, 528 U.S. at 123-24, the Supreme Court recognized that "the Fourth Amendment requires at

- 43 -

least a minimal level of objective justification for making [a] stop" and that an "officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Citation modified). In Wardlow, id. at 124, two officers of eight in a four-car caravan converged on an area known for heavy narcotics trafficking, and encountered a large number of people, including people who were purchasing drugs and serving as lookouts. The respondent fled upon seeing police officers. See id. at 122. Two of the officers followed the respondent in their vehicle, and an officer stopped and frisked the respondent. See id. at 121-122, 124. The Supreme Court concluded that, although an individual's presence in a high-crime area alone does not support reasonable suspicion, based on the respondent's unprovoked headlong flight and the area being a high-crime area, the officer who stopped and frisked the respondent was justified in suspecting that the respondent may have been involved in criminal activity and in investigating further. See id. at 125.

To be sure, in Wardlow, id. at 125, the Supreme Court stated that the conduct in Terry "justifying the stop was ambiguous and susceptible of an innocent explanation" and that "*Terry* recognized that the officers could detain the individuals to resolve the ambiguity." (Citing Terry, 392 U.S. at 5-6, 30). But, in Terry, 392 U.S. at 30, the Supreme Court did not hold that officers could detain individuals to resolve ambiguity as to whether a person was engaged in legal or illegal conduct. Rather, the Supreme Court described the officer's observations as involving "unusual conduct which le[d] him reasonably to conclude in light of his experience that criminal activity may be afoot[.]" Id. The essence of the reasonable suspicion analysis in Terry is that an officer must have objective,

articulable reasons indicating that a person has engaged in or is about to engage in criminal activity, not that an officer who observes ambiguous conduct can stop an individual to resolve any ambiguity.  See Terry, 392 U.S. at 21-23.

The State's position would threaten to radically expand the circumstances in which individuals engaged in innocent behavior could be routinely subjected to seizure.  After all, a driver observed on a road with a 35-mile an hour speed limit traveling at a speed that an officer judges might be right above or below 35 miles an hour may be breaking the law but also may not.  A pedestrian on a street corner drinking clear liquid from an open container could be consuming water, but also could be consuming gin.  A person eating a brownie while sitting on a stoop could be engaged in unhealthy snacking or, if the brownie is laced with LSD, unlawful snacking.  And someone walking out of a store with unbagged merchandise, getting into a car, and driving away, could be an eco-conscious individual in possession of new merchandise they had just purchased lawfully or merchandise they had just stolen.  Under our law, reasonable articulable suspicion requires more than that someone is engaged in activity equally compatible with unlawful and very common lawful activities.

In reaching this conclusion, we do not require certainty of criminal conduct to satisfy the reasonable suspicion standard.  We simply reaffirm that a stop must be based on specific facts that, taken together, under the totality of the circumstances, reasonably indicate that criminal activity may be occurring.  The pertinent inquiry is whether, based on articulable facts, a reasonable officer would conclude that criminal activity may be afoot—not whether an officer who merely wonders whether criminal activity might be

- 45 -

occurring may detain a person to resolve the ambiguity.

Neither Officer Huff's nor Officer Wheat's testimony rose to the level of establishing that they observed conduct that was equally indicative of legal or illegal activity, and that, based on specific facts, the conduct gave rise to reasonable suspicion to justify an investigatory stop. First, as the Appellate Court noted, Officer Huff testified "alternatively" about what the conduct appeared to be, and in doing so acknowledged that the observed conduct appeared like the completely legal and exceptionally common activity of placing a call that would not have been the basis for suspicion of a traffic violation under TR § 21-1124.2(d)(2). Stone, 2025 WL 289120, at *8. Second, in addition to acknowledging that the observed conduct appeared to be compatible with the completely innocent activity of placing a call that would not warrant police intervention, Officer Huff at no time testified that the conduct he observed—the driver manipulating the phone—was indicative of a traffic law violation. Officer Huff's testimony consisted of the cryptic observation of a driver manipulating a phone appearing either like placing a call (innocent behavior) or typing a message (ambiguous behavior). After that, using a term of art, Officer Huff testified only that the officers conducted "a traffic stop[.]" Although officers are not required to rule out all possible inferences that are consistent with innocence before reasonable suspicion is established, this does not obviate the requirement that, to justify an investigatory stop, an officer must have a particularized and objective basis for a belief that the conduct at issue is suspicious of criminal activity or, in this case, a traffic violation. See, e.g., Lewis, 398 Md. at 362, 920 A.2d at 1087.

Perhaps cognizant of the deficiencies in Officer Huff's testimony, the prosecutor

specifically asked Officer Wheat, who testified after Officer Huff, about the reason for the traffic stop. Officer Wheat, who was the driver of the police car and the officer who effectuated the stop, responded that "[i]t was for using the mobile device while the vehicle was in motion." Officer Wheat's response demonstrates that the officers stopped Mr. Stone for apparently innocent conduct that did not constitute reasonable suspicion for a traffic stop.[20]

A reasonable police officer, in the officers' position, would not have concluded that seeing a person "using [a] mobile device while [a] vehicle was in motion[,]" justified the stop of a vehicle for a violation of TR §§ 21-1124 through 21-1124.2. Although TR § 21-1124 prohibits drivers under the age of 18 from using a wireless communication device while operating a motor vehicle other than to contact a 9-1-1 system or as a text messaging device as defined in TR § 21-1124.1, there is no indication that the officers thought Mr. Stone was under the age of 18. And, while TR § 21-1124.2(c)(2) provides that the holder of a learner's instructional permit or a provisional driver's license who is 18 years of age or older may not use a handheld telephone while operating a motor vehicle, the subsection does not preclude such a person from using a handheld telephone to contact a 9-1-1 system or other emergency service providers, or from using a handheld telephone as a text messaging device as defined in TR § 21-1124.1, which would include using GPS. And, drivers, in general, under TR §§ 21-1124.1 and 21-1124.2, are permitted to use their hands

---

[20]Body camera footage that was admitted into evidence demonstrates that, consistent with Officer Wheat's testimony, Officer Huff advised Mr. Stone that he was stopped for "using" a cell phone while driving.

to use a text messaging device or handheld telephone to initiate or terminate a call, turn the handheld telephone on or off, use GPS, or contact a 9-1-1 system or other emergency services. Given the number of permitted uses of mobile phones under TR §§ 21-1124 through 21-1124.2, an officer testifying that he stopped a person for using a cell phone while driving provides neither a fact-specific nor objectively reasonable basis for the stop.

We decline to prescribe a particular set of circumstances that are required to give rise to reasonable suspicion of a violation of TR §§ 21-1124 through 21-1124.2. As the Supreme Court of the United States has observed, the concept of reasonable suspicion is fluid and any attempt to define it would be pointless. See Ornelas, 517 U.S. at 695-96. That said, we observe that in this case there was no testimony concerning basic information, such as how long a period of time the officers observed Mr. Stone manipulating the phone, whether Mr. Stone even appeared to be looking in the direction of the phone, or the reasons that Mr. Stone's conduct appeared consistent with typing a text message. The officers did not identify facts that support the conclusion that, although Mr. Stone may have been engaged in conduct that was indicative of either lawful or unlawful activity, there was an objectively reasonable basis to suspect that he had committed or was committing a traffic violation.

Even if Officer Huff had not testified in the alternative and had testified only that the driver appeared to be typing a message, without explaining why the driver's conduct gave that appearance, that bare observation lacks the factual support necessary to establish reasonable suspicion. An officer's mere conclusion or hunch does not establish reasonable suspicion. See Cartnail, 359 Md. at 289-90, 753 A.2d at 528-29. Officer Huff did not

describe or provide any facts about what caused him to suspect that the driver might be typing a message. Officer Huff did not indicate that the driver was tapping the phone or even using a finger to press or touch the phone, that he could see a screen that did not look like a dial pad or GPS screen, that the driver was looking at the screen longer than would be expected to place a call or check GPS, or that the driver's manipulation of the phone appeared to exceed what would be expected to turn a mobile phone off or on or to enter an address or location for GPS.

In its analysis, the Appellate Court, relying in part on Williams, noted that the officers did not distinguish between the appearance of lawful conduct (*e.g.*, placing a call) versus unlawful conduct (*e.g.*, texting). See Stone, 2025 WL 289120, at *9. The Appellate Court is correct that neither officer provided any details or explanation as to why the driver's manipulation of the phone "appeared like" typing a message or placing a phone call or what in their view the difference in appearance, if any, might be with respect to the two actions. We point out, however, that although we held in Williams, 401 Md. at 691-92, 934 A.2d at 47-48, in the context of reasonable suspicion to stop a vehicle for a tinting violation, that distinguishing between the appearance of a lawfully tinted window and an unlawfully tinted window could give rise to reasonable suspicion, the ability to make such a distinction is not a mandatory requirement of the reasonable suspicion analysis. While an officer being able to state that the officer could make such a distinction would be helpful to the reasonable suspicion determination, an officer's ability to tell the difference between the lawful use and unlawful use of a mobile phone is not mandatory to establish reasonable suspicion for a violation of TR §§ 21-1124 through TR §§ 21-1124.2.

Observing a driver manipulate, press, or touch the screen of a cell phone, though, is no more indicative of a traffic violation than seeing someone momentarily cross the edge line of a roadway or almost be involved in an accident. See Rowe, 363 Md. at 441, 769 A.2d at 889; Lewis, 398 Md. at 358, 369, 920 A.2d at 1085, 1091. The conduct that the officers in this case described could have applied to any person using a GPS device for, among other things, a routine delivery or turning on or off a mobile phone. Neither officer provided any facts with respect to a reason that the driver manipulating the phone or touching or pressing its screen "appeared like . . . typing a message" or that a violation of a traffic law had or was occurring. Although there is no mandatory prescription for what constitutes reasonable suspicion of a violation of TR §§ 21-1124 through 21-1124.2, the determination involves a fact-specific inquiry and an objectively reasonable standard that was not satisfied here.

Moreover, the conduct the officers observed in this case was unquestionably not "out of the ordinary" and, to the contrary, was "too common place to be probative in tending to show criminal activity." Ferris, 355 Md. at 386-87 (Quoting Karnes, 62 F.3d 493). It is a fact of modern life that drivers commonly and frequently place phone calls from, and use the GPS functions of, their phones. Under Maryland law, those extremely common and frequent uses of mobile phones are legal. And yet, under the State's theory, any driver in the State engaged in either activity could be lawfully pulled over by a police officer, with sirens and flashing lights activated, and subjected to questioning at any time. If that would be permitted, it would not "eliminate a substantial portion of innocent travelers," Ferris, 355 Md. at 387, 735 A.2d at 507 (citation modified); Cartnail, 359 Md.

at 291, 753 A.2d at 529-30 (citation modified), and would, instead, subject much of the State's driving population "to virtually random seizures[.]" Ferris, 355 Md. at 387 (quoting Reid, 448 U.S. at 441). That is not our law.

### *In re D.D.*

The State relies on In re D.D., 479 Md. 206, 277 A.3d 949 (2022), for the premise that when police officers observe conduct that is equally suggestive of legal and illegal conduct, the Fourth Amendment allows the officers to perform an investigatory stop to resolve any ambiguity as to whether a person was violating the law. But, this is not the principle set forth by our holding in D.D., and if its actual holding were properly considered, D.D. is distinguishable from this case based on differences in the facts and the statutory prohibitions at issue. In D.D., 479 Md. at 217, 277 A.3d at 955, we held that "the odor of marijuana provide[d] reasonable suspicion of criminal activity sufficient to conduct a brief investigatory detention." Our holding in D.D. was an extension of our holding in Robinson v. State, 451 Md. 94, 133, 152 A.3d 661, 685 (2017), in which we stated that "'the odor of marijuana remains evidence of a crime' . . . because the use or possession of 10 grams or more of marijuana remains a criminal offense in Maryland." D.D., 479 Md. at 231-32, 277 A.3d at 964. As we stated in D.D., id. at 232, 277 A.3d at 964, "partial decriminalization has reduced the level of certainty associated with the odor of marijuana on a person from probable cause that the person has committed a crime to reasonable suspicion that the person has committed a crime or is in the process of committing a crime[,]" and as such, "a brief investigatory detention based solely on the odor of marijuana is reasonable[.]"

D.D. does not stand for the proposition that any time officers observe that a person has engaged in behavior that appears to be either completely innocent conduct or innocuous conduct that could be indicative of lawful or unlawful behavior, officers have reasonable suspicion to stop the person to resolve any ambiguity as to the type of conduct the person has engaged in. If it did, D.D. would have represented a significant break from the jurisprudence from this Court and the United States Supreme Court discussed above. In D.D., we did not purport to break from that jurisprudence, which establishes that although innocent conduct may give rise to reasonable suspicion, "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Cartnail, 359 Md. at 294, 753 A.2d at 531 (citation modified). And, moreover, the innocent conduct must "eliminate a substantial portion of innocent travelers[.]" Ferris, 355 Md. at 387, 735 A.2d at 507 (citation modified).

In D.D., id. at 231-32, 277 A.3d at 964, we concluded that partial "decriminalization ha[d] not rendered the odor of marijuana free of all criminal suspicion. Rather, the odor of marijuana remain[ed] evidence of a crime because the use or possession of 10 grams or more of marijuana remain[ed] a criminal offense in Maryland." (Citation modified). We acknowledged, as D.D. observed, "that there are many wholly innocent reasons why someone might smell of marijuana[,]" but concluded that that did "not render the odor of marijuana free of reasonable suspicion." Id. at 235, 277 A.3d at 966. Our holding in D.D. and discussion of the reasonable suspicion standard was tied to the unique situation posed by the odor of marijuana. We stated that "a particular circumstance or set of circumstances

- 52 -

may satisfy the reasonable suspicion standard but fall short of probable cause. That is precisely the case with respect to the odor of marijuana." Id. at 231, 277 A.3d at 964.

We found persuasive the reasoning of courts from other jurisdictions in cases such as People v. Looby, 68 V.I. 683 (2018), and In Re: O.S., 112 N.E.3d 621 (Ill. App. Ct. 2018), holding that the odor of marijuana in the post-decriminalization context justified a finding of reasonable suspicion because marijuana remained contraband and the odor of marijuana remained indicative of criminal activity. See D.D., 479 Md. at 239, 277 A.3d at 968.[21] We explained that, in People v. Zuniga, 372 P.3d 1052, 1059 (Colo. 2016), the Supreme Court of Colorado held that "although state law permits possession of an ounce or less of marijuana, because other marijuana-related activities remain unlawful, 'the odor of marijuana is still suggestive of criminal activity.'" D.D., 479 Md. at 239-40, 277 A.3d at 968. These cases describe the rationale on which we grounded our holding.

In D.D., id. at 237-38, 277 A.3d at 967, the respondent argued that unlike an officer observing hypothetical butts of a handgun, window tints, and dead bodies on the ground, the odor of marijuana alone did not provide the same type of "concrete information" that

---

[21]In Looby, 68 V.I. at 697-98, the Supreme Court of the Virgin Islands upheld a finding of reasonable suspicion based on the odor of marijuana on the ground that marijuana remained contraband subject to seizure even though possession of an ounce or less may no longer have been subject to criminal penalization. In O.S., 112 N.E.3d at 634, the Appellate Court of Illinois concluded that "case law holding that the odor of marijuana is indicative of criminal activity remains viable notwithstanding the recent decriminalization of the possession of not more than 10 grams of marijuana[.]" The Appellate Court concluded that Illinois still prohibited the knowing possession of marijuana and operating a vehicle while impaired and under the influence of marijuana and, therefore, the "odor of marijuana was indicative of criminal activity and provided the officers with reasonable suspicion to believe that criminal activity was afoot." Id.

allows an officer to reasonably infer that an individual is engaged in criminal activity. We

rejected this argument and stated unequivocally that "[a]n officer's detection of the odor

of marijuana is also a 'concrete observation' that supports further investigation." Id. at

238, 277 A.3d at 967 (citations omitted). We stated:

> An officer who lacks probable cause to arrest is not required "to simply shrug
> his shoulders and allow a crime to occur or a criminal to escape." *Adams v.*
> *Williams*, 407 U.S. 143, 145 (1972) (citation omitted). When a police officer
> smells marijuana on someone, it is certainly the case that the person may
> possess less than 10 grams of marijuana or they may possess no marijuana at
> all. But it also is possible that the person is presently in possession of 10 or
> more grams of marijuana. Under D.D.'s reasoning, police officers would be
> powerless to conduct a brief investigatory detention to try to determine which
> category the person is in. That is not what the Fourth Amendment requires.

Id. at 238, 277 A.3d at 968. We explained that the odor of marijuana remained indicative

of criminal activity, that the odor of marijuana is a concrete observation that supports

reasonable suspicion, and that, even though it may turn out that a person possesses no

marijuana at all, the decriminalization of less than 10 grams of marijuana did not negate

the odor of marijuana giving rise to reasonable suspicion for an investigatory stop. The

premise of an investigatory stop being generally permissible to clarify any ambiguity with

respect to a police officer's observations as to whether a person is or is not engaged in

unlawful activity was not discussed or even mentioned in D.D.

Also lending to the dissimilarity between D.D. and this case, the nature of an

investigatory stop with respect to texting while driving is potentially far more intrusive

than an investigation into the smell of marijuana. Determining whether a driver is or had

been engaged in a lawful, permitted use of a mobile phone or texting while driving might

involve an officer questioning the driver and seeking consent to inspect the driver's cell

phone to assess whether there is evidence of recent texting activity (as opposed to making a telephone call or operating the phone's navigation system). "[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." Riley v. California, 573 U.S. 373, 395 (2014) (citation omitted). "[A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." Id. at 396.[22] Permitting officers to conduct an

_____

[22]Although this case did not involve a request by the officers to search Mr. Stone's cell phone, available data reflects that thousands of drivers in Maryland were stopped for cell phone violations in 2023 and 2024. According to the Maryland Governor's Office of Crime Prevention and Policy's Race-Based Traffic Stop Data Dashboard, in 2023, the year that Mr. Stone was stopped, there were 22,328 cell phone stops in Maryland under TR §§ 21-1124.1 through 21-1124.3, and in 2024, there were 23,907 stops. See Md. Governor's Off. of Crime Prevention & Pol'y, Race-Based Traffic Stop Data Dashboard, available at https://perma.cc/52ZY-3JK3 (2023 data); https://perma.cc/Y99N-EHQA (2024 data). The Dashboard data indicates, however, that the Hagerstown Police Department conducted 77 cell phone traffic stops in 2023, with zero searches and zero arrests, available at https://perma.cc/ED99-EC7T, despite the fact that Mr. Stone was stopped for using a cell phone while driving, and both he and his vehicle were searched and he was arrested. It is not possible to discern why the search of Mr. Stone and his vehicle and his arrest are not attributed to the Hagerstown Police Department under the cell phone stop category. It may be that because the officers involved gave various reasons for the search of Mr. Stone's person and his vehicle, such as Mr. Stone not having a license and the search of the vehicle being an inventory search, and the searches uncovered suspected drugs, the search and arrest were not attributed to a cell phone stop. However, the Dashboard data also indicates that the Hagerstown Police Department had 36 cell phone traffic stops in both 2021 and 2022 and 43 stops in 2024, and in all three years there were zero searches and zero arrests. See Md. Governor's Off. of Crime Prevention & Pol'y, Race-Based Traffic Stop Data Dashboard, available at https://perma.cc/3ER2-G5GB (2021 data for Hagerstown Police Department); https://perma.cc/N2EK-H6LK (2022 data for Hagerstown Police

- 55 -

investigatory stop to clear up any ambiguity as to whether a driver has violated TR §§ 21-1124, 21-1124.1, or 21-1124.2, where it is unclear that a driver has even engaged in suspicious behavior, would not only violate the Fourth Amendment reasonable suspicion standard but also would potentially allow officers the opportunity to seek access to private information contained in the cell phones of people who have engaged in no suspicious, let alone illegal, conduct at all.

Importantly, in 2023, the General Assembly enacted Md. Code Ann., Crim. Proc. (2001, 2018 Repl. Vol., 2023 Supp.) ("CP") § 1-211 and effectively overruled this Court's holding in D.D. CP § 1-211(a) provides in relevant part:

> (a) A law enforcement officer may not initiate a stop or a search of a person, a motor vehicle, or a vessel based solely on one or more of the following:
>
> (1) the odor of burnt or unburnt cannabis[.]

House Bill 1071, the session law from which CP § 1-211(a) was derived, was introduced for the purpose of providing, among other things, "that a finding or determination of reasonable suspicion or probable cause relating to possession of contraband or other criminal activity may not be based solely on evidence of the odor of certain cannabis[.]" First Reader, H.B. 1071, Md. Gen. Assemb., 2023 Reg. Sess. (Md. 2023), https://mgaleg.maryland.gov/2023RS/bills/hb/hb1071f.pdf [https://perma.cc/YXV3-A4QZ].

The Revised Fiscal and Policy Note for House Bill 1071 discussed then-current law and, in a subsection titled "*Probable Cause to Arrest – Odor of Marijuana*," described this

Department; https://perma.cc/32KH-ASH5 (2024 data for Hagerstown Police Department).

- 56 -

Court's holding in <u>D.D.</u>, stating that "the Court [] held that 'the odor of marijuana provides reasonable suspicion of criminal activity sufficient to conduct a brief investigatory detention.' *In re D.D.*, 479 Md. 206 (2022)." Fiscal and Policy Note (Enrolled – Revised), at 8, H.B. 1071, 2023 Gen. Assemb., Reg. Sess. (Md. 2023), https://mgaleg. maryland.gov/2023RS/fnotes/bil_0001/hb1071.pdf [https://perma.cc/2FZX-DVDQ]. To the extent that the State contends that <u>D.D.</u> stands for the proposition that an officer may stop a person to clear up any ambiguity as to whether the person is violating the law in any way, <u>D.D.</u> does not stand for this proposition.

### *The Officers' Observations and Other Jurisdictions' Mobile Phone Case Law*

A review of the analysis of the decisions of courts in other jurisdictions supports our conclusion that, in this case, the officers did not have reasonable suspicion to stop Mr. Stone. Although reasonable suspicion may include use of any commonsense inferences rationally drawn from the facts, see <u>Terry</u>, 392 U.S. at 21, in <u>Morsette</u>, 924 N.W.2d at 440, where the officer "was unable to articulate why his suspicion was reasonable[,]" the Supreme Court of North Dakota declined to infer that the officer's observation of a driver "manipulating" the screen of a cell phone for approximately two seconds (and even tapping on the screen) was conduct indicative of a violation of the no-texting law. That is exactly the circumstance in this case—Officers Huff and Wheat observed Mr. Stone manipulating, touching, or pressing the screen of a cell phone and did not provide any basis or explanation, reasonable or otherwise, for a belief that he may have been texting or engaged in conduct that violated TR §§ 21-1124, 21-1124.1, or 21-1124.2.

Assessing the State's view of the evidence (which was not the basis of the circuit

court's ruling)—that Officer Huff characterized Mr. Stone's conduct as appearing to be "placing a phone call" or "typing a message"—demonstrates that Officer Huff explained that he observed either conduct that appeared to be completely legal (placing a call) or conduct that appeared to be a potential violation of TR § 21-1124.1 (typing a message). Although "[t]he reasonable suspicion inquiry falls considerably short of 51% accuracy, for, . . . to be reasonable is not to be perfect[,]" Glover, 589 U.S. at 381 (citation modified), reasonable suspicion mandates that the officer identify "specific and articulable facts which, taken together with rational inferences from those facts," lead to the belief that criminal activity may have taken place, Terry, 392 U.S. at 21. Under the State's view of the evidence, Officer Huff's testimony did not come close to even identifying whether he suspected "a permitted or a forbidden use" of a cell phone, Morsette, 924 N.W.2d at 438 (quoting Paniagua-Garcia, 813 F.3d at 1014), let alone to constituting reasonable suspicion of a forbidden use.

Just as the Seventh Circuit observed in Paniagua-Garcia, 813 F.3d at 1014, in this case, Officer Huff "hadn't seen any texting; what he had seen was consistent with any one of a number of lawful uses of cellphones." Viewing the evidence in the light most favorable to the State, Officer Huff testified that it was possible that Mr. Stone was placing a phone call or typing a message. Although the concept of reasonable articulable suspicion deals in "probabilities" rather than "hard certainties[,]" United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009) (citation modified), as the Seventh Circuit explained in Paniagua-Garcia, 813 F.3d at 1014, the mere possibility of unlawful use of a cell phone is not alone enough to create reasonable suspicion of a criminal act.

- 58 -

For a number of reasons, we are not swayed by the Supreme Court of Iowa's holding in Struve. In Struve, 956 N.W.2d at 94, 99, the Supreme Court of Iowa considered a statute with broader prohibitions than ours and facts that were much more specific than the facts in evidence here. In determining whether the officers had reasonable suspicion for the stop, the Court explained:

> [A]s the officers moved alongside the driver's side of [the defendant's] car, [one] Officer [] observed the driver holding a cell phone in front of his face for at least ten seconds, which lit up the interior of the dark car, and saw the driver "manipulating the screen with his thumb as he was driving." The patrol car was beside and just behind the driver, which allowed [the] Officer [] "to view [the defendant's] hands and the fact that his hand was up in front of his face with the cell phone and that he was manipulating the screen." [The] Officer [] testified the phone was "up in front of the steering wheel, pretty much directly in front of [the defendant's] face." The screen was "very bright," which allowed [the] Officer [] "to see [the defendant's] thumb moving back and forth in front of it." [The other] Officer [], who was driving the patrol vehicle, likewise observed [the defendant] holding the lit phone in front of his face and manipulating it in his hand. The thirty-second dashcam video introduced into evidence confirms that the cell phone was lit up during the entire approximate ten-second period during which the officers followed [the defendant] and assessed whether he appeared to be improperly using his cell phone.

Id. at 102-03 (citation modified). The Court concluded that "[t]he officers followed alongside [the defendant] and observed him holding the phone in front of his face for a significant period of time while manipulating it, actions consistent with improper use of his phone." Id. at 105.

Adding to the reasons that we do not find Struve instructive, Iowa's statutory prohibitions are broader than those of our no-texting statute. The Supreme Court of Iowa noted that "[t]he legislature expanded the scope of section 321.276 . . . to address the significant public safety issues associated with distracted driving caused by cell phones."

- 59 -

Id. The legislature "broadened the statute's coverage from 'text messages' to 'electronic messages,' changed its prohibition of 'reading' such messages to 'viewing' them, [and] redefined relevant terms[.]" Id. at 99 (citations omitted). As such, unlike TR § 21-1124.1, the Iowa statute prohibits viewing electronic messages and also defines an electronic message as including "images visible on the screen of a hand-held electronic communication device including[,]" among other things, internet sites. Id. Under the Iowa statute, a driver having a mobile phone with a text message visible on the screen without any indication that the driver read or attempted to respond to the message could potentially violate the statute. By contrast, although TR § 21-1124.1(b) provides that "an individual may not use a text messaging device to write, send, or *read* a text message or an electronic message while operating a motor vehicle in the travel portion of the roadway." (Emphasis added).

As the Supreme Court of Iowa explained, "the extent of conduct prohibited by the statute as well as the actual conduct observed by the officers are both critical to the reasonable suspicion analysis." Struve, 956 N.W.2d at 102. The Court acknowledged that "not every driver seen using a cell phone in any manner may be presumed to be violating" the Iowa statute, but "reasonable suspicion does not require an officer to rule out all innocent explanations." Id. at 104. The Court reasoned that "the officers' observations of [the defendant] holding the lit cell phone in front of his face for at least ten seconds while manipulating the screen [with his thumb] allowed them to briefly stop [the defendant] and clear up the ambiguity created by his actions, particularly in light of the expanded coverage of activity prohibited by section 321.276." Id. at 105. In other words, given the broad

statutory prohibitions and the specificity of the officers' observations, reasonable suspicion justified the stop. The same cannot be said about this case.

After review of case law from other jurisdictions, two theories of the reasonable suspicion analysis surface that merit discussion. The first theory is that a police officer may make a commonsense inference that a person observed to be manipulating a cell phone while driving may be engaged in illegal activity. In interpreting its broad statute that prohibited viewing an electronic message, in Struve, id. at 103, the Supreme Court of Iowa relied in part on this position. The second theory, explained by the dissent in Morsette, 924 N.W.2d at 441 (VandeWalle, C.J., dissenting), is essentially that, because the physical action of performing permitted and prohibited uses of a cell phone while driving may look the same, a failure to find reasonable suspicion where an officer observes conduct that may be indicative of legal or illegal activity would result in enforcement of no-texting statutes being rendered meaningless.[23] In Morsette, 924 N.W.2d at 435-36, 440, though, contrary to the dissent's view, the Supreme Court of North Dakota concluded that because there was no connection between the officer's observations and an objectively reasonable ground to suspect a violation of the law, reasonable suspicion was not established. And, in Paniagua-Garcia, 813 F.3d at 1014, the Seventh Circuit concluded that because the officer was unable

_____

[23]Chief Justice VandeWalle dissented, stating that it was "improbable that someone observing at a distance a person using a cell phone is able to determine the specific use of the device[,]" and that, "[a]s a practical matter," "the result is that either every driver using a cell phone may be reasonably suspected of using the cell phone for a prohibited purpose or no driver may be reasonably suspected of using the device for an unlawful purpose." Morsette, 924 N.W.2d at 441 (VandeWalle, C.J., dissenting). The Chief Justice stated that, in his view, the majority opinion "substantially reduces, if not eliminates, the effective enforcement of the statute." Id. (VandeWalle, C.J., dissenting).

to discern the difference between a permitted or prohibited use by glancing into a car as he drove by, reasonable suspicion was not established.

In light of Maryland's statutory framework, which expressly permits a range of common mobile phone uses while driving, our analysis yields a similar result. Given the number of permitted uses of a mobile phone under both TR §§ 21-1124 to 21-1124.2—such as operating a GPS device, contacting 9-1-1 or other emergency services, placing or ending a telephone call, and turning on and off the phone—we cannot conclude that there is a rational inference that a person seen manipulating, pressing, or touching the screen of a mobile phone is engaged in a prohibited use. Similarly, we do not agree that the alleged inability in some instances to discern prohibited conduct from permitted conduct should be a basis for determining that the reasonable suspicion standard has been satisfied. Case law from other jurisdictions demonstrates that police officers are capable of making observations of prohibited conduct involving texting while driving and explaining the observations in testimony which courts have found sufficient to establish reasonable suspicion.[24] More critically, allowing police officers to stop drivers when they are in fact unable to discern if there are grounds to do so violates the reasonable suspicion standard

---

[24]Like the Appellate Court, we note that our holding is consistent with the holdings reached by courts in Struve, 956 N.W.2d 90, Dalton, 850 S.E.2d 560, and Corrales, 152 Cal. Rptr. 3d 667, cases in which reasonable suspicion was established where officers identified specific facts that caused them to suspect a violation of the traffic law. See Stone, 2025 WL 289120, at *9. The officers provided details about why they believed illegal behavior had occurred (more than just that a driver was seen manipulating or pressing the screen of a phone). See Struve, 956 N.W.2d at 102-03; Dalton, 850 S.E.2d at 562, 565; Corrales, 152 Cal. Rptr. 3d at 669-70. The level of specificity concerning the actual conduct observed by the police officers and the reasonableness of the officers' action determined the outcome of the reasonable suspicion analysis.

and the Fourth Amendment.

Applying the principles set forth in <u>Terry</u>, it is well established that in light of the important government interest in detecting and preventing crime, the Fourth Amendment permits an investigatory stop based on reasonable suspicion that criminal activity may be afoot and that reasonable suspicion does not require certainty or even more than 51% accuracy. <u>See</u> <u>Glover</u>, 589 U.S. at 381; <u>Arvizu</u>, 534 U.S. at 274. In "balancing the need to search (or seize) against the invasion which the search (or seizure) entails[,]" <u>Terry</u>, 392 U.S. at 21, without doubt, the governmental interest underlying the enactment of TR §§ 21-1124 through 21-1124.2 is an important one—the protection of the public from injury by distracted drivers. However, the nature and quality of the intrusion on individual rights under the Fourth Amendment has the potential to be excessive if the statutes are permitted to be enforced with reasonable suspicion based on generalized or overly broad observations of conduct that may apply to almost any driver on the roadway.

## Conclusion

For the reasons discussed herein, we hold that the stop of Mr. Stone's vehicle was not justified by reasonable suspicion and that the circuit court erred in denying Mr. Stone's motion to suppress.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS.**

Circuit Court for Washington County
Case No.: C-21-CR-23-000386
Argued: October 3, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 16

September Term, 2025

_____

STATE OF MARYLAND

v.

MICHAEL EUGENE STONE

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Dissenting Opinion by Gould, J.,
which Biran, J. and Eaves, J. join.

_____

Filed: January 27, 2026

Introduction

The Fourth Amendment permits police officers to conduct a brief investigatory stop when they observe conduct that may constitute a criminal offense. That straightforward principle should resolve this case. Officers Scott Huff and Travis Wheat observed Mr. Stone manipulating his cell phone screen while driving—conduct that violates Maryland law unless it falls within a statutory exception. The officers could not determine from their vantage point whether Mr. Stone was engaged in prohibited texting or, for example, permitted GPS navigation. Under this Court's decision in *In re D.D.*, 479 Md. 206 (2022), and over a half-century of United States Supreme Court precedent, the officers were entitled to conduct a brief traffic stop to resolve that ambiguity.

The Majority holds otherwise by lifting phrases like "innocent conduct" and "innocuous behavior" from cases involving fundamentally different circumstances and deploying those phrases without regard to the context in which they arose. In doing so, the Majority disregards Supreme Court authority establishing that officers need not "rule out the possibility of innocent conduct[,]" *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citation omitted), and that reasonable suspicion "'falls considerably short' of 51% accuracy," *Kansas v. Glover*, 589 U.S. 376, 381 (2020) (citation omitted). The Majority also fails to conduct the balancing analysis required by *Terry v. Ohio*, 392 U.S. 1 (1968)—an analysis that, when performed, decisively favors the constitutionality of the stop.

The practical consequences of the Majority's holding are significant. Under the Majority's analysis, an officer who witnesses a driver commit what could be a criminal offense—such as typing a text message to a friend—cannot conduct an investigatory stop

because the officer cannot rule out that the driver was instead pressing the screen to terminate a call or enter a GPS address. As a result, Maryland's distracted driving laws have been largely rendered unenforceable before a tragedy occurs—a consequence not compelled by the Fourth Amendment and at odds with the policy judgment that animated the General Assembly's decision to enact these laws in the first place.

I respectfully dissent.

## Discussion

### I

### A

The Fourth Amendment's reasonable articulable suspicion standard exists to distinguish between police action based on a *hunch* and police action based on *facts*. As the Supreme Court explained in *Terry*, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21 (footnote omitted). "Anything less[,]" the Court warned, "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id.* at 22 (citations omitted).

Here, the officers acted on objective facts and articulated those facts at the suppression hearing. Officer Huff testified: "While we were behind [the car] going west on West North Ave, we observed the operator begin to manipulate the cellphone that was mounted to the dash or windshield, and it appeared like he was typing a message or placing a phone call while he was driving the vehicle." When asked to describe what he observed,

2

Officer Huff explained: "I saw him with his right hand manipulate the phone, touching it while he was driving down the roadway." Officer Wheat corroborated these observations: "I observed the driver, he had a cellphone that was stuck to the windshield of the vehicle. I could see the cellphone illuminated when I was behind it, and I saw him pressing the screen while he was driving."

These are not hunches. They are observations of conduct that—depending on its purpose—may constitute a criminal violation of sections 21-1124.1 and 21-1124.2 of the Transportation Article of the Maryland Annotated Code. MD. CODE ANN., TRANSP. ("TR") §§ 21-1124.1, 21.1124.2 (2020 Repl. Vol.). It would be one thing if the officers had testified that they saw Mr. Stone move his hand in the direction of a cell phone but did not actually see his hand touch it. But that is not what happened. The officers observed Mr. Stone manipulating, touching, and pressing his illuminated cell phone screen in a manner that looked like texting while his vehicle was in motion. Under Maryland law, writing, sending, or reading a text message while driving is prohibited unless the driver is using GPS or contacting emergency services. TR § 21-1124.1(b), (c). Using one's hands to operate a handheld telephone while driving is likewise prohibited, except for initiating or terminating a call, or turning the phone on or off. TR § 21-1124.2(d)(2). Under this scheme, so much as sending—or reading—a single-character text message violates the law. The officers observed specific conduct that, depending on the purpose of the conduct— something unknowable from their vantage point—potentially constituted a crime. A brief traffic stop was constitutionally permissible to determine whether Mr. Stone's conduct fell within the prohibition or an exception.

3

B

Not so, says the Majority. Notwithstanding that the officers testified that they saw Mr. Stone "manipulate" the phone while driving and also "press[] the screen" in a manner that "appeared like he was typing a message or placing a phone call[,]" the Majority found their testimony lacking:

> Officer Huff did not describe or provide any facts about what caused him to suspect that the driver might be typing a message. Officer Huff did not indicate that the driver was tapping the phone or even using a finger to press or touch the phone, that he could see a screen that did not look like a dial pad or GPS screen, that the driver was looking at the screen longer than would be expected to place a call or check GPS, or that the driver's manipulation of the phone appeared to exceed what would be expected to turn a mobile phone off or on or to enter an address or location for GPS.

Maj. Op. at 48-49.

Such hair-splitting is not the stuff of a proper *Terry* analysis. Faced with Officer Huff's testimony that he saw Mr. Stone "manipulate the cellphone" in a manner that appeared like he was "typing a message or placing a phone call," the suppression court was entitled to infer that Officer Huff saw Mr. Stone *use his finger* while doing so. Beyond that, the only real issue is whether the reasonable suspicion standard required the officers to provide more information to rule out the possibility that Mr. Stone was placing a call or using GPS. The answer to that question is no.

The reasonable suspicion standard tolerates ambiguity and coexists with plausible innocence. The standard does not require ruling out innocent explanations, nor does it require that the officer's observations make the prospect of criminal activity more likely than not. The objective inquiry asks only whether the totality of the circumstances

4

reasonably supports an inference of wrongdoing, even if lawful explanations remain possible.

In *Arvizu*, the Supreme Court of the United States confirmed that the existence of lawful explanations is compatible with reasonable suspicion, holding that an officer "need not rule out the possibility of innocent conduct[]" before making a brief investigatory stop. 534 U.S. at 277 (citation omitted). Despite this holding, the Majority leans heavily on the fact that cell phone manipulation may indicate, for example, lawful conduct such as GPS navigation, and therefore concludes that reasonable suspicion does not exist because the officers' "[l]imited observations" "do not rule out 'a substantial portion of innocent' drivers[.]" Maj. Op. at 40 (citation omitted); *see also id.* at 41-42, 47. But *Arvizu* forecloses that approach. The Fourth Amendment permits a stop to test the officer's reasonable, fact-based suspicion, not just to confirm a smoking-gun observation.

*Illinois v. Wardlow*, 528 U.S. 119 (2000), makes the same point. There, police officers were patrolling a Chicago neighborhood "known for heavy narcotics trafficking" when they saw the respondent standing on the street with a bag. *Id.* at 121-22. The respondent "looked in the direction of the officers and fled[,]" which prompted the officers to give chase and stop him. *Id.* at 122. The Supreme Court thought it "undoubtedly true" that there could have been "innocent reasons" for the respondent's behavior, but, relying on *Terry*, it nevertheless found no Fourth Amendment violation. *Id.* at 125. "Even in *Terry*," the Court reasoned, the conduct was "ambiguous and susceptible of an innocent explanation." *Id.* at 125. The officer in *Terry* had observed two men "pacing back and forth in front of a store, peering into the window and periodically conferring." *Id.* (citation

5

omitted). "All of this conduct was by itself lawful," the Court in *Wardlow* observed, "but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals *to resolve the ambiguity*." *Id.* (emphasis added) (citation omitted). "In allowing such detentions," the Court continued, "*Terry* accepts the risk that officers may stop innocent people." *Id.* at 126.

Twenty years later in *Glover*, the Supreme Court emphasized that "[t]he reasonable suspicion inquiry falls considerably short of 51% accuracy, for, as we have explained, to be reasonable is not to be perfect." 589 U.S. at 381 (citation modified) (first citing *Arvizu*, 534 U.S. at 274; then citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). We recognized *Glover's* low bar in *D.D.*, stating: "the level of suspicion necessary to constitute reasonable, articulable suspicion is *considerably less* than proof of wrongdoing by a preponderance of the evidence and obviously less demanding than that for probable cause." *D.D.*, 479 Md. at 231 (emphasis added) (citation omitted).

Those guideposts should have framed the Majority's analysis. Instead, the Majority implies that an officer may make a stop only when crime is the more likely explanation for what he sees. *See* Maj. Op. at 42 (suggesting that where "the conduct that the officers observed could have been equally indicative of legal or illegal activity," the officer must identify additional facts that indicate "criminal activity was or may have been occurring[]" (citation omitted)); *id.* at 45 ("Under our law, reasonable articulable suspicion requires more than that someone is engaged in activity equally compatible with unlawful and very common lawful activities.").

6

The Majority largely relegates *Glover* to a footnote and does not engage with its holding. Maj. Op. at 35 n.14. But *Glover* is on point. There, an officer ran a license plate check and discovered that the registered owner's driver's license had been revoked. *Glover*, 589 U.S. at 379. The officer then stopped the vehicle, inferring that the owner was likely driving. *Id.* The Supreme Court upheld the stop, holding that this "commonsense inference" was sufficient even though it was entirely possible someone else was driving.[1] *Id.* at 381-82.

The Majority's approach cannot be reconciled with *Glover*. If a "commonsense inference" that the registered owner is likely driving—an inference that could easily be wrong—is sufficient for reasonable suspicion, then surely an officer's observation of conduct that may constitute a statutory violation provides reasonable suspicion as well. Without expressly saying so, the Majority's contrary rule imposes a preponderance standard—even more than is required for probable cause—where the Fourth Amendment demands only a *reasonable* suspicion. And that standard was satisfied here: The officers reasonably suspected that Mr. Stone had violated the anti-texting statute when they saw him engage in conduct indistinguishable from conduct that violates the statute.

---

[1] The Majority tries to distinguish *Glover* by drawing attention to the nature of Kansas's license revocation scheme, but the Supreme Court made clear that its analysis did not turn on anything unique to Kansas law. The eight-justice majority thought that "common sense suffices to justify" the determinative inference of criminality, adding for good measure that "Kansas law reinforces" that conclusion. *Id.* at 382.

## C

The Majority's analysis relies on a misapplication of language about "innocent conduct" taken from cases involving entirely different circumstances. The Majority extracts phrases like "wholly innocent factors," "facially innocent activity," "innocent travelers," "out of the ordinary," and "innocuous conduct" from *Terry*, *Reid v. Georgia*, 448 U.S. 438 (1980), *United States v. Sokolow*, 490 U.S. 1 (1989), and this Court's precedents, and applies them without considering the contexts in which they arose. It takes cases in which officers observe conduct that is not indicative of any crime, and applies them here, where the officers observed conduct that *itself* could be the suspected offense. To show the Majority's error, I turn, once again, to *Terry*.

From its inception in 1968, the doctrine of reasonable suspicion acknowledged that seemingly innocent acts might warrant investigation. *Terry*, 392 U.S at 22-23. In *Terry* itself, the Court approved a stop-and-frisk based on an officer observing conduct that was "perhaps innocent" but "warranted further investigation." *Id.* This was a foundational recognition that officers can draw inferences of criminal activity from the totality of the circumstances, even if each individual factor implicates nothing criminal.

A few years after *Terry*, President Nixon announced the War on Drugs, and *Terry*'s recognition that innocent conduct can support reasonable suspicion took on new importance. Law enforcement officials focused on catching drug smugglers and dealers before their product hit the streets. But this is easier said than done. Drug smugglers know that the nail that sticks out gets the hammer.

8

Soon, however, authorities began developing drug-courier profiles to identify suspects. *Sokolow*, 490 U.S. at 10 n.6 ("Since 1974, the DEA has trained narcotics officers to identify drug smugglers on the basis of . . . circumstantial evidence[.]"). These profiles identified couriers by characteristics that were both innocent and yet "typical of persons transporting illegal drugs." *See Florida v. Royer*, 460 U.S. 491, 493 n.2 (1983). Agents were taught to pay special attention to, for example, young, nervous individuals who dress casually, carry heavy luggage, and pay for their ticket in cash. *See id.*

Use of these profiles generated significant Fourth Amendment concern. *See Karnes v. Strutski*, 62 F.3d 485, 489 (3d Cir. 1995) (noting that "the use of indicators or drug courier profiles has been sharply challenged" (citation omitted)). While *Terry* authorized police officers to consider innocent factors, it also taught that "the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge[.]" 392 U.S. at 21. An officer's knowledge of "the modes or patterns of operation of certain kinds of lawbreakers[]" may make them suspicious of an individual, *United States v. Cortez*, 449 U.S. 411, 418 (1981), but judges do not have that expertise. Therefore, the Fourth Amendment requires officers to articulate "a particularized and objective basis for suspecting legal wrongdoing." *Lewis v. State*, 398 Md. 349, 362 (2007) (citation modified); *Derricott v. State*, 327 Md. 582, 589 (1992) ("It is the evidentiary significance of what actually occurred that provides the basis for reasonable suspicion."). Officers must articulate some reason why the "innocent conduct" is, in fact, suspicious. Otherwise, "there

9

is no ability to review the officer's action." *Ransome v. State*, 373 Md. 99, 111 (2003) (citation omitted).

The Majority's demand that conduct be "out of the ordinary," *see* Maj. Op. at 40, 50, is similarly misguided. While the Court in *Sokolow* observed that paying for plane tickets with a roll of $20 bills is "out of the ordinary," 490 U.S. at 8, it was not imposing an "out of the ordinary" requirement, but rather explaining how an observation of innocent conduct can still have evidentiary weight; that is, when that conduct is unusual in a way that bears on the suspected offense. Once officers articulate conduct that maps directly onto a statute, whether that conduct is "out of the ordinary" is beside the point.

The Majority thus hangs its hat on a line of cases that addresses a concern not implicated here. It takes the concept of "innocent" and "out of the ordinary" conduct and applies it to a context in which the officers have an objective basis—observation of conduct that, depending solely on the purpose of the act, could constitute a crime—to suspect an individual of wrongdoing. The testimony here did not require the suppression court to trust the officers and "rubber stamp" their inarticulable suspicion. *See Ransome*, 373 Md. at 111. Rather, the officers offered the court a specific evidentiary basis for their suspicion that Mr. Stone violated the law: They saw conduct indistinguishable from the offense. Viewed in this light, the Majority's reliance on *Reid*, *Sokolow*, and our case law applying the same is misplaced.

What the officers observed here is different in kind than *Reid*, for example. In *Reid*, DEA agents stopped two men at an airport because they: (1) arrived from Fort Lauderdale, a "principal place of origin of cocaine"; (2) arrived early in the morning, "when law

10

enforcement activity is diminished"; (3) "appeared to the agent to be trying to conceal the fact that they were traveling together"; and (4) "apparently had no luggage other than their shoulder bags." 448 U.S. at 441. The Court held that this was an insufficient basis for the stop, observing that only the third factor—the apparent attempt to conceal their association—"relates to their particular conduct[,]" while "[t]he other circumstances describe a very large category of presumably innocent travelers[.]" *Id.*

The critical distinction is that *Reid* involved factors that bore *no direct relationship* to any criminal activity. Arriving from a particular city is not a crime. Arriving early in the morning is not a crime. Having only a shoulder bag is not a crime. The officers were attempting to *infer* drug trafficking from circumstantial evidence that had nothing to do with the suspected offense. Here, by contrast, the officers observed conduct that *is itself prohibited* by statute in many circumstances. The *Reid* framework applies where officers attempt to stitch together unrelated innocent attributes to support an inference of criminality, not where officers observe conduct that is—depending on its purpose—itself criminal.

For similar reasons, the Majority's reliance on *Cartnail v. State*, 359 Md. 272 (2000), is misplaced. There, an officer pulled over a gold-colored Nissan with two black men because police had information that, earlier that morning, three black men driving a gold-colored Mazda had robbed a motel in a different part of town. *Id.* at 277-78. In other words, the officer "had only facially innocent activity to generate reasonable suspicion ***because no suspicious activity had been personally observed***." *Id.* at 290 (emphasis added) (footnote omitted). This Court invalidated the stop, flagging that the officer had nothing

11

more than "gender, race, and arguably the color of the car." *Id.* at 293. Those characteristics, of course, are not criminal. If officers rely on innocent factors like those as a basis for a stop, the factors must "be narrow enough to eliminate a great number of objectively innocent individuals[.]" *Id.* at 291 (citing *Ferris v. State*, 355 Md. 356, 386-87 (1999)).

This case is nothing like *Cartnail*. There, the officers observed innocent and constitutionally sensitive characteristics, none of which alone or considered together indicated any criminal conduct. Indeed, the officers stopped Mr. Cartnail only because the officers drew a tenuous connection between those characteristics and the description of the suspects from the earlier-reported robbery. Here, the basis for suspicion is of an entirely different category: first-hand observation of potentially criminal conduct, something this Court in *Cartnail* expressly noted was lacking. *See id.* at 290. We do not need to prohibit police officers from conducting stops in these circumstances to "reaffirm our holding[] in . . . *Cartnail*[.]" *See* Maj. Op. at 5.

The other Maryland cases on which the Majority relies—*Ferris v. State*, 355 Md. 356 (1999); *Rowe v. State*, 363 Md. 424 (2001); *Lewis v. State*, 398 Md. 349 (2007); *State v. Williams*, 401 Md. 676 (2007); and *Crosby v. State*, 408 Md. 490 (2009)—are likewise unhelpful, because none of the observed conduct in those cases was itself the subject of any criminal prohibition. Having bloodshot eyes is not a crime. *See Ferris*, 355 Md. at 363-64. "Almost" causing an accident is not a crime. *See Lewis*, 398 Md. at 354-56. Slumping in one's seat is not a crime. *See Crosby*, 408 Md. at 496. Momentarily touching an edge line is not, without more, a crime. *See Rowe*, 363 Md. at 427-28. But touching a cell phone

12

screen while driving *is* a crime in many circumstances. The Majority's reliance on these cases fails to account for such distinctions.

D

This Court's decision in *D.D.* provides the analytical framework for resolving this case. There, the officer's observations—the odor of marijuana—were equally consistent with lawful and unlawful activity. At the time, possession of less than 10 grams of marijuana was a civil offense, not a crime; possession of 10 grams or more was criminal. Thus, the odor of marijuana could have indicated either noncriminal conduct (possession of less than 10 grams) or criminal conduct (possession of 10 grams or more).

The respondent in *D.D.* argued that because the officer could not determine from the odor alone whether the person possessed a lawful or criminal amount, the officer lacked reasonable suspicion. This Court rejected that argument:

> When a police officer smells marijuana on someone, it is certainly the case that the person may possess less than 10 grams of marijuana or they may possess no marijuana at all. But it also is possible that the person is presently in possession of 10 or more grams of marijuana. Under [respondent's] reasoning, police officers would be powerless to conduct a brief investigatory detention *to try to determine which category the person is in*. That is not what the Fourth Amendment requires.

479 Md. at 238 (emphasis added).

The same logic applies here. Just as it would be unreasonable to expect an officer to discern from the smell of marijuana the quantity possessed, it would be unreasonable to expect an officer, from the vantage point of another vehicle, to discern the precise purpose served by a driver's touching of a cell phone screen. This Court in *D.D.* made clear that where an officer observes conduct or circumstances that are consistent with lawful and

13

unlawful activity, the officer is not required to resolve that ambiguity before conducting a brief investigatory stop. To the contrary, *resolving the ambiguity is precisely the purpose of the stop. See Adams v. Williams*, 407 U.S. 143, 145 (1972) (discussing that an officer who lacks probable cause need not "shrug his shoulders and allow a crime to occur").

The Majority errs three times over in attempting to distinguish *D.D. First*, it discounts *D.D.* by asserting that it was "tied to the unique situation posed by the odor of marijuana." Maj. Op. at 52. Not so. There is nothing "unique" about the analytical framework *D.D.* applied; this Court did not create a special marijuana exception to the Fourth Amendment. Rather, applying the same old reasonable suspicion principles articulated in *Terry*, *Arvizu*, and *Glover,* we explained that "a particular circumstance or set of circumstances may satisfy the reasonable suspicion standard but fall short of probable cause. That is precisely the case with respect to the odor of marijuana." *D.D.*, 479 Md. at 231. That reasoning applies with equal force here: The observation of cell phone manipulation while driving satisfies the reasonable suspicion standard even if it does not rise to the level of probable cause.

*Second*, the Majority contends that "[t]he premise of an investigatory stop being generally permissible to clarify an[] ambiguity . . . was not discussed or even mentioned in <u>D.D.</u>" Maj. Op. at 54. The Court in *D.D.* did far more than "discuss" or "mention" this premise; we built our holding around it. We agreed that the lower court had erred by "requiring police at the nascent stage of an investigation to have certainty that criminal activity is afoot before being able to conduct an investigatory stop meant to confirm or dispel that suspicion." *D.D.*, 479 Md. at 224 (citation modified). We also made clear that

14

such a stop is permissible because the Fourth Amendment allows officers "to attempt to determine whether criminal activity is afoot." *Id.* at 238. And we justified the investigatory intrusion by noting that, if the police officers discovered no additional evidence of a crime, "the group would have been free to go on its way in short order." *Id.* at 241 (citation omitted). We noted that the suspects only had to remain seated "while the officers briefly investigated whether their behavior constituted a criminal offense[.]" *Id.*

*Third*, the Majority contends that the General Assembly's 2023 enactment of section 1-211 of the Criminal Procedure Article—which prohibits stops based solely on the odor of cannabis, MD. CODE ANN., CRIM. PROC. ("CP") § 1-211 (2001, 2018 Repl. Vol., 2023 Supp.)—"effectively overruled this Court's holding in D.D." Maj. Op. at 56. That argument misconstrues both our opinion in *D.D.* and the General Assembly's legislative authority. In *D.D.*, this Court decided an issue of federal constitutional law—specifically, what the Fourth Amendment requires for an investigatory stop. Although individual members of the General Assembly—like all citizens—are free to disagree with this Court's decisions on constitutional matters, it is not the General Assembly's role to overrule them. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). What the General Assembly *has* the institutional authority to do—and what it *did* do in enacting CP § 1-211—is grant Maryland citizens *greater* privacy protections than the Fourth Amendment floor. The General Assembly made a policy judgment that, notwithstanding this Court's determination that the Fourth Amendment permits a brief investigatory detention based on

15

the odor of cannabis, such a stop should be prohibited as a matter of State law. Such legislative action does not undercut our Fourth Amendment analysis in *D.D.*

In short, the Majority misreads *D.D.*, which should control this case. It narrows *D.D.* by limiting its applicability to marijuana-odor cases when *D.D.* was a straightforward application of *Terry* and its progeny. It claims that *D.D.* never addressed investigatory stops to clarify ambiguity when in fact that premise anchored the holding. And it asserts that the General Assembly effectively overruled the holding of *D.D.* when it did no such thing and, in any case, has no power to do so.

E

*Terry* teaches that the Fourth Amendment analysis turns on "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." 392 U.S. at 19. This reasonableness analysis requires balancing governmental interests against the individual interests of private citizens. After all, "there is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Id.* at 20-21 (citation modified); *Trott v. State*, 473 Md. 245, 255 (2021) ("Whether a particular warrantless action on the part of the police is reasonable under the Fourth Amendment depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." (quoting *Pacheco v. State*, 465 Md. 311, 321 (2019))); *Sellman v. State*, 449 Md. 526, 540 (2016) ("Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." (citation omitted)).

16

To its credit, the Majority cites *Terry* and takes note of this balancing test. Maj. Op. at 17. However, the Majority neglects to undertake the balancing in a meaningful fashion, stating only that "the governmental interest . . . is an important one[,]" but that "the intrusion . . . has the potential to be excessive[.]" *Id.* at 63. *Terry* contemplates a more rigorous analysis which, when performed here, decisively favors the constitutionality of the stop.

1

The starting point under *Terry* is "the nature and extent of the governmental interests involved." 392 U.S. at 22. *Terry* places at the center of that inquiry the State's interest in "effective crime prevention and detection[.]" *Id.* As a general matter, "crime prevention is a weighty social objective" and a "legitimate and compelling state interest." *Schall v. Martin*, 467 U.S. 253, 264 (1984) (citation modified). But here, that interest is only the beginning.

This case strikes at the core of a State's duty "to protect and guard, as far as possible, the lives and health of its inhabitants[.]" *See N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908). The General Assembly enacted TR §§ 21-1124 through 21-1124.2 because distracted driving poses a grave danger to public safety. *See* Floor Report, S.B. 321, The Delegate John Arnick Electronic Communications Traffic Safety Act of 2010, 2010 Leg., 430th Sess., at 3 (2010) (compiling research). Studies have shown that "[d]rivers were 23.2 times more likely to be involved in a safety-critical event while text messaging[]"—more than "writing, using a calculator, looking at a map, dialing a cell phone, [or] reading." U.S. Dep't of Transp., Fed. Motor Carrier Safety Admin., FMCSA-

17

RRR-09-042, *Driver Distraction in Commercial Vehicle Operations* 43 (Sept. 2009), available at https://perma.cc/HNH9-BACD. The statutes at issue here thus advance the State's "compelling interest in highway safety." *See Mackey v. Montrym,* 443 U.S. 1, 19 (1979).

In determining whether an investigatory stop was reasonable under the circumstances, we "consider the gravity of the risk of public harm." *Trott*, 473 Md. at 270. This factor takes on special weight in certain contexts, including a particularly analogous one: drunk driving investigations. In *Trott*, this Court observed that "[u]nlike crimes involving possessory offenses, such as carrying an illegal gun or possessing drugs, the crime of drunk driving poses a significant and potentially imminent public danger." *Id.* Drunk driving "often has an immediate deadly impact on innocent citizens who unknowingly step into its path." *Id.* For this reason, law enforcement would be ill-advised to adopt a "wait-and-see approach[,]" which "may prove fatal." *Id.* (citation omitted).

As the Majority recognizes, the potential harm from distracted driving is on par with the potential harm caused by drunk driving. Maj. Op. at 1 (observing that distracted driving "can be more dangerous than drinking and driving" (citation omitted)). Indeed, the roadside carnage of a wreck caused by distracted driving is indistinguishable from a wreck caused by drunk driving, and the human toll is just as appalling. So, while the governmental interest here is, at a general level, an interest in crime prevention and detection, the precise characterization registers heavier on the *Terry* balancing scale: the State's interest in preventing the predictable, and often catastrophic, harms associated with impaired driving on public roads.

18

Against this compelling governmental interest, we must weigh "the nature and quality of the intrusion on individual rights[.]" *Terry*, 392 U.S. at 24. In the traffic-stop context, that intrusion is analyzed across two dimensions: duration and personal autonomy. Here, the intrusion is limited on both fronts.

A traffic stop is inconvenient, embarrassing, and perhaps uncomfortable, but it is not a prolonged affair. Investigative detentions are "temporary" and "last no longer than is necessary to effectuate the purpose of the stop." *Byndloss v. State*, 391 Md. 462, 480 (2006) (quoting *Royer*, 460 U.S. at 500). The intrusion lasts only as long as necessary to confirm or dispel the officer's suspicions. As the Supreme Court observed in the *Miranda* context,

> The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.

*Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (footnote omitted). A *Terry* stop may make an individual late to their next appointment, but no one should spend the night in jail on reasonable suspicion alone. *Terry* doesn't even permit a trip to the station house. For that, officers need probable cause. *Dunaway v. New York*, 442 U.S. 200, 212 (1979) ("The officer may question the driver and passengers . . . and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975) (emphasis omitted))).

Neither is an investigative stop—particularly in the context of these statutes—overly intrusive as a matter of personal autonomy. Although the intrusion on privacy occasioned by a routine traffic stop is real, it is limited. An officer is not, in most circumstances, permitted to handcuff an individual or otherwise use force based on reasonable suspicion alone. *See Longshore v. State*, 399 Md. 486, 502 (2007) ("[G]enerally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." (citation omitted)). And while an officer may frisk an individual under *Terry*, the search is permitted only when the officer believes the individual is "armed and presently dangerous," and it is "limited to that which is necessary for the discovery of weapons." *Terry*, 392 U.S. at 26, 30.

As *Terry* recognized, an investigative seizure is less intrusive than a custodial arrest: "An arrest is the initial stage of a criminal prosecution" that is "inevitably accompanied by future interference with the individual's freedom of movement[.]" 392 U.S. at 26. A brief investigatory stop, by contrast, involves no such ongoing consequences. This Court in *D.D.* echoed that sentiment: "Being stopped for a short amount of time so that an officer can ask a few questions does not do the same violence to the fundamental privacy expectation in one's body that being placed in handcuffs and physically searched does." 479 Md. at 236 (citation omitted).

The Majority adopts a strained reading of the case law to exaggerate the nature and extent of the intrusion. It invokes *Riley v. California*, 573 U.S. 373 (2014), for the proposition that cell phones contain "a digital record of nearly every aspect of [people's] lives—from the mundane to the intimate." Maj. Op. at 55 (citation omitted). From this, the

20

Majority reasons that permitting investigatory stops based on cell phone manipulation "would potentially allow officers the opportunity to seek access to private information contained in the cell phones of people who have engaged in no suspicious, let alone illegal, conduct at all." Maj. Op. at 56.

This reasoning conflates two distinct Fourth Amendment inquiries: reasonable suspicion to determine the constitutionality of the stop and probable cause to determine the constitutionality of a warrantless search of the cell phone. *Riley* addressed the latter question, holding that police generally must obtain a warrant before searching a cell phone seized incident to arrest. 573 U.S. at 401. *Riley* did not address the first question and the sole issue here: whether the officers had reasonable suspicion to stop Mr. Stone. The Majority's innuendo notwithstanding, holding that the stop here was based on reasonable suspicion would not mean that the officers had probable cause to search Mr. Stone's cell phone.

Even if *Riley* was on point, it wouldn't bolster the Majority's argument that these stops are particularly intrusive. Although a stop "might involve . . . seeking consent to inspect the driver's cell phone[,]" Maj. Op. at 54-55, the possibility of a consent search does not compound the intrusiveness of a stop under the *Terry* balancing test. Intrusiveness for *Terry* purposes refers to what the State involuntarily compels. A *request* for consent is not compulsion and, if that consent is given, the officer's actions can hardly be described as intrusive. An officer is free to ask, and the individual is free to say no. *See Ferris*, 355 Md. at 375 (citation omitted). The individual is also free to limit his consent to, for example, permitting the officer to view recent text messages to prove that he was not texting while

21

driving. *See State v. McDonnell*, 484 Md. 56, 81 (2023). For that reason, consensual encounters do not "invade[]" privacy interests and thus do not implicate the Fourth Amendment. *Ferris*, 355 Md. at 375.

In any event, the Majority's concern that sanctioning this stop would permit widespread searches is overblown. As will be discussed in Part II, the Governor's Office collects and analyzes data on all traffic stops in Maryland. While police officers may ask for a consent search, the statistics show that searches of either kind—consent or compelled—rarely occur. In 2024, law enforcement made 23,907 stops for cell phone use while driving, 92.4% of which lasted less than five minutes and .31% of which resulted in a search. Md. Governor's Off. of Crime Prevention & Pol'y, Race-Based Traffic Stop Data Dashboard, available at https://perma.cc/Y99N-EHQA. In other words, only 75 of the near 24,000 stops resulted in a search of any kind.

In short, the Majority's attempt to marshal *Riley* and the possibility of consent searches just doesn't work. Under the *Terry* balancing test, the intrusion is minimal.

3

Weighing these factors, the balance decisively favors permitting the stop. On one side of the scale is the government's compelling interest in protecting human life by enforcing laws designed to prevent distracted driving—a leading cause of fatal accidents. On the other side is the relatively minor intrusion of a brief traffic stop lasting only minutes. Under these circumstances, an officer is justified in making a stop.

The Majority's disregard of the balancing test is more than just an oversight. It created the analytical void that enabled inapt analogies to creep into its analysis:

22

> [A] driver observed on a road with a 35-mile an hour speed limit traveling at a speed that an officer judges might be right above or below 35 miles an hour may be breaking the law but also may not. A pedestrian on a street corner drinking clear liquid from an open container could be consuming water, but also could be consuming gin. A person eating a brownie while sitting on a stoop could be engaged in unhealthy snacking or, if the brownie is laced with LSD, unlawful snacking. And someone walking out of a store with unbagged merchandise, getting into a car, and driving away, could be an eco-conscious individual in possession of new merchandise they had just purchased lawfully or merchandise they had just stolen.

Maj. Op. at 45.

Although each case is evaluated on its own facts and circumstances, any rigorous application of the *Terry* balancing test to the Majority's hypotheticals would take into consideration that: (1) an officer has various tools at his disposal to measure the speed of a vehicle, and a *Terry* stop is not one of them;[2] (2) an officer has the luxury of time to make additional observations about a pedestrian's conduct and demeanor to generate or dispel suspicion concerning the legality of the contents of an open container; (3) an officer likewise has the luxury of time to observe the behavior and conduct of the person eating a brownie on a stoop; and (4) merchants would not want police to stop customers leaving their stores simply because they have unbagged merchandise because there are far less intrusive means to distinguish between paying customers and shoplifters. And, most importantly, an analysis that gave proper weight to the nature and extent of the government's interest would never put shoplifting, drinking from an open container, or eating an LSD-laced brownie on the same plane as measures designed to reduce the

---

[2] We have all heard of police officers rhetorically asking drivers, "do you know how fast you were driving?" But I have never heard of a police officer, who doesn't already know how fast the person was driving, ask such a question.

roadside carnage caused by distracted driving. *See Trott*, 473 Md. at 270 (distinguishing possessory crimes from drunk driving on this basis). Put simply, holding that the stop of Mr. Stone was constitutional does not mean that police would be free to stop any random person who could, at that moment, conceivably be committing a crime. By refusing to apply *Terry*'s balancing test, the Majority obscures, rather than illuminates, the principles at play.

II

A

By requiring officers to rule out exceptions to the prohibition before making a stop, the Majority's holding effectively neuters Maryland's distracted driving statutes as a tool for preventing tragic auto accidents. It demands too much of officers and thereby elevates the governing standard to something beyond reasonable suspicion. Under the Majority's analysis, the officer must resolve ambiguity before making the stop by making additional observations such as the contents of the screen of the phone (dial pad or GPS?), the length of time the driver focused on the screen, and the manner of the driver's manipulation of the phone. *See* Maj. Op. at 48-49. The practical consequence is that the *Terry* stop is eliminated from an officer's toolkit for enforcing these laws. In other contexts, depriving law enforcement of one of its tools may not hamper enforcement. With these statutes, however, probable cause is unlikely to develop, and the opportunities for a consensual encounter before a tragic collision are vanishingly thin.

The General Assembly presumably understood that to enforce the distracted driving statutes, officers would be making observations of drivers of moving vehicles, sometimes

24

traveling at fast speeds, from shifting angles through multiple layers of glass. Either the officer is stationary while observing the conduct of another driver, in which case the observation window may be only a fraction of a second, or the officer is in a moving car, in which case the officer driving the car must not only investigate a potential crime, but also drive safely. The conduct at issue involves quick hand movements and downward glances that may be obscured. Rarely will the officer see precisely what is happening on the phone. Under these circumstances, an officer cannot reasonably be expected to distinguish between tapping out a text message, a phone number on a dial pad, or an address in a GPS app. Nor does *Terry* or its progeny ask that of them.[3]

## B

Although the potential for widespread traffic stops when citizens are engaged in permitted cell phone usage while driving is a reasonable concern, that concern arises not from the Fourth Amendment but from public policy decisions of the General Assembly to criminalize some, but not all, forms of cell phone usage while driving. The Fourth Amendment merely asks whether: (1) the government's interest justifies the intrusion, and (2) whether the officer can articulate facts supporting a reasonable suspicion of criminal activity. Both inquiries are satisfied here.

---

[3] There may be rare instances in which officers are able to definitively rule out lawful use of a phone. For example, if two officers are in a police SUV that pulls alongside and to the left of a car and travels next to that car for some period of time, the police officer who is in the passenger seat of the SUV may be able to tell with certainty that the driver of the other car is texting or reading a text message. In that instance, the officer would have probable cause to cite the driver.

The General Assembly may decide, as a matter of public policy, that the enforcement of these statutes should be governed by a standard stricter than the Fourth Amendment. If so, it can "impose greater restrictions on police activity than those [the Supreme] Court holds to be necessary" under the federal Constitution. *Oregon v. Hass*, 420 U.S. 714, 719 (1975) (citations omitted). And as we know from the General Assembly's response to this Court's decision in *D.D.*, the General Assembly is aware of its prerogative to do just that.

In fact, the General Assembly has the tools available to determine whether, in its judgment, the enforcement efforts are leading to abusive traffic stops or imposing unreasonable burdens on drivers. Specifically, TR § 25-113 requires that law enforcement agencies collect and compile data for each traffic stop, including why the stop was made, whether the stop resulted in a search or arrest, the race or ethnicity of the driver, and the approximate duration of the stop. TR § 25-113(d), (e)(1). The Governor's Office of Crime Prevention and Policy analyzes this data and displays it on a publicly available dashboard.[4] *Id.* § 25-113(f)(1), (f)(2)(i).

This data gives the General Assembly the ability to determine, on an informed record, whether enforcement of these statutes aligns with its policy choices. *See* TR § 25-113(f)(2)(iv) (requiring that the Governor's Office notify the General Assembly when the data is updated). So, if the General Assembly concludes that the Fourth Amendment

---

[4] As noted above, in 2024, Maryland officers made over 23,900 traffic stops for cell phone use, only .31% of which resulted in searches of any kind. Md. Governor's Off. of Crime Prevention & Pol'y, Race-Based Traffic Stop Data Dashboard, available at https://perma.cc/Y99N-EHQA.

26

permits more traffic stops than are desirable as a matter of policy—just as it concluded after *D.D.* that stops based on the odor of cannabis were undesirable notwithstanding their constitutionality—the General Assembly remains free to enact legislation limiting such stops. That's precisely the type of public interest balancing the General Assembly has the expertise and political accountability to perform.

## III

The Majority faults Officer Huff for acknowledging that Mr. Stone could have been engaging in the lawful activity of making a phone call and distinguishes *Terry* on the ground that the officer in *Terry* apparently did not similarly acknowledge an alternative explanation for what he observed. Maj. Op. at 43. I find it implausible that the outcome in *Terry* would have been different if the officer in that case had conceded the possibility that criminal activity may *not* have been afoot. That is, I doubt the Court in *Terry* would have faulted the officer for acknowledging the very ambiguity the Court held that officers could resolve through a brief investigatory stop. By faulting Officer Huff for acknowledging such an ambiguity, the Majority takes Fourth Amendment jurisprudence to new places and, in doing so: (1) injects subjectivity into an otherwise objective analysis; and (2) incentivizes officers to keep their cards close to their vests in suppression hearings, thus depriving suppression courts of critical information.

## Conclusion

The Majority extracts phrases about "innocent conduct" from cases involving fundamentally different circumstances and deploys them without regard to the contexts in which they arose. It ignores controlling Supreme Court authority establishing that officers

27

need not "rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277, and that reasonable suspicion "falls considerably short of 51% accuracy," *Glover*, 589 U.S. at 381 (citation omitted). It fails to conduct the balancing analysis that *Terry* requires. And it renders Maryland's distracted driving laws effectively unenforceable before a tragic accident.

Under *D.D.* and the Supreme Court precedents on which it rests, where an officer observes conduct that is consistent with lawful and unlawful activity, the officer may conduct a brief investigatory stop to resolve the ambiguity. The officers here observed Mr. Stone manipulating and pressing his cell phone screen while driving—conduct that could be criminal depending on its purpose. The brief traffic stop was necessary to determine whether that purpose was lawful (GPS navigation, terminating a call) or unlawful (texting). That is precisely what the Fourth Amendment permits.

I would reverse the judgment of the Appellate Court. Justice Biran and Justice Eaves have authorized me to state that they join this dissent.